Royce Glen **FRENCH**, Appellant,

v.

**Dr. A. E. BRODSKY**, Appellee.

No. 16443.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

March 6, 1975.

Rehearing Denied April 3, 1975.

Holloway & Rhem, John H. Holloway, Houston, for appellant.

Jerry V. Walker, Stephen C. Dillard, Houston, Fulbright & Jaworski, Houston, of counsel, for appellee.

EVANS, Justice.

This medical malpractice action was instituted by Royce Glen French against Dr. A. E. Brodsky who had performed three disc operations on French in October, 1967, June, 1968 and November, 1968. At the trial Mr. French complained that Dr. Brodsky had failed to accurately diagnose and remove a herniated disc between the third and fourth lumbar vertebrae on the occasion of the second and third surgeries. The jury failed to find that Mr. French had a herniated disc at the L3–4 vertebral inter-space on the occasion of the second or third surgeries and conditionally submitted issues as to negligence and causation were not answered. The damage issues were answered "zero." A take nothing judgment was entered on the basis of the jury's verdict and French appeals.

In his first six points of error French contends:

1) that the trial court abused its discretion in permitting impeachment of his expert witness, Dr. Warren Ross, by allowing collateral evidence showing that his staff privileges had been suspended at Breckenridge Hospital in Austin, Texas;

2) that the trial court abused its discretion in allowing the former administrator of Breckenridge Hospital to give impeachment testimony and evidence in impeachment of Dr. Ross because such person resided more than 100 miles from Houston and could not be reached by trial subpoena;

3) that the trial court erred in admitting in evidence the minutes of the Breckenridge Hospital board of trustees for impeachment purposes, contending that Article 4447d, Sec. 3, Vernon's Tex.Rev.Civ.Stat.Ann., prohibits use of such records;

4) that the trial court abused its discretion in admitting in evidence (as Exhibit 2) a letter from the former administrator of Breckenridge Hospital to Dr. Ross and (as Exhibit 3) the minutes of the board of trustees of that hospital evidencing that that board had approved recommendation of its medical executive committee to cancel Ross's membership on the medical staff of the hospital, contending that such evidence was inadmissible as hearsay and collateral impeachment, that such records were unauthenticated and also that their use was prohibited by Article 4447d, Sec. 3;

5) that the trial court abused its discretion in refusing his motion for mistrial after Dr. Ross was questioned as to whether his staff privileges had been terminated at Breckenridge Hospital;

6) that the trial court erred in quashing subpoenas issued by him for hospital and grievance records in an attempt to impeach Dr. Brodsky and in refusing to permit further examination of Dr. Brodsky to obtain information as to the suspension or curtailment of his hospital privileges.

An examination of the record reflects that point of error number 2 is not germane to any assignment of error in French's motion for a new trial and the point cannot be considered by this court. Rules 374 and 418, Texas Rules of Civil Procedure; Nixon v. Nixon, 348 S.W.2d 438 (Tex. Civ.App.—Houston 1961, writ dism'd). Insofar as contentions under said point of error are also asserted under other points of error properly preserved, such matters will be considered.

Dr. Ross was called as a witness on behalf of Mr. French and gave expert medical testimony to the effect that Dr. Brodsky, during the second and third operations on Mr. French, failed to properly explore and locate a herniated disc at the L3–4 level. Dr. Brodsky was of course entitled to offer evidence which tended to rebut the credibility of Dr. Ross as a medical expert. He was not entitled, however, to offer impeachment evidence as to collateral matters. Goodnight v. Phillips, 458 S.W.2d 196, 199 (Tex.Civ.App.—Houston 1970, writ ref'd n. r. e.).

Upon direct examination Dr. Ross testified that he was a practitioner of the orthopedic specialty of medicine in Austin, Texas and that he was a graduate of the University of Tennessee College of Medicine. He stated that after a year of internship at Scott & White Clinic in Temple, Texas, he had one year of surgical residency at Newell Hospital in Chattanooga, Tennessee and that he then returned to Scott & White for three years of his specialty training. He stated that he was licensed by the State of Texas and that his license was on file in the county of his residence and defined his medical specialty as being concerned with "conditions involving the spine or extremities which is the back and arms and legs."

On cross-examination Dr. Ross gave the following testimony:

"Q Are you certified by the American Board of Orthopedic Surgeons?

"A No, sir.

"Q What is the largest hospital in the City of Austin? Breckenridge?

"A I don't know. They built two others and I don't know the bed capacity of any of them.

"Q I beg your pardon?

"A I do not know the bed capacity of any hospital in Austin.

"Q Are you admitted to perform surgery at Breckenridge Hospital in Austin, Texas?

"A I probably am. I am not on the active staff.

"Q Do you not have active staff privileges, do you, sir?

"A I am not on the active staff. I have not made application.

"Q Your staff privileges were removed some years ago, weren't they sir?

"A No, sir."

At this point French's counsel moved for a mistrial which was overruled by the court.

During subsequent cross-examination Dr. Ross testified that he could not recall having received a communication from the administrator of Breckenridge Hospital in October, 1969 and indicated his memory was not refreshed by being shown copy of a letter addressed to him from Mr. Ben Tobias, former administrator of Breckenridge Hospital dated October 24, 1969 concerning the advisory board of trustees of Breckenridge Hospital.

Later during the trial Mr. Ben Tobias was examined out of the presence of the

jury and identified a letter which had been sent to Dr. Ross dated October 24, 1969 which was introduced as Defendant's Exhibit 3 and read as follows:

"Dear Dr. Ross:

On behalf of the advisory board of trustees of Breckenridge Hospital it is my responsibility to inform you that the board at a meeting on October 24, 1969, approved the recommendation of the medical executive committee to cancel your membership on the medical staff of Breckenridge Hospital effective immediately.

Sincerely,

Ben Tobias, Administrator"

Upon voir dire examination by Mr. French's counsel an objection was leveled against the letter that it was not the best evidence of the action taken by the advisory board and that the minutes themselves would be the best evidence. Dr. Brodsky's counsel then offered certified copies of certain minutes and records of the board which contained the following reference to Dr. Ross:

"3. Recommendation for Termination of Physician Staff Membership—Dr. Calhoon said that in 1964 a review of the cases of a surgeon indicated that some of his cases were not warranted and he was placed on probation until a review of his surgery could be made from time to time. It was found that he moved his practice to other hospitals and there were very few cases performed in this hospital so at a later date it was determined that on all cases he should have a consultant. Just recently he performed three operative procedures without a consultant. The Medical Executive Committee asked him to attend one of their meetings to show just cause why his staff membership should not be cancelled for disregarding the direction of the Executive Committee to have a consultant on all cases. After the hearing the Medical Executive Committee voted to recom-

mend to the Advisory Board of Trustees that the physician's staff membership be cancelled. Dr. Calhoon said it was with regret that this recommendation had to be made.

"VOTED: On motion of Dr. Dryden, seconded by Miss Moreno, the Board voted unanimously to approve the recommendation of the Medical Executive Committee to cancel the Staff Membership of Warran Ross, M. D."

The jury was then returned and upon direct examination of Dr. Brodsky's counsel, Mr. Tobias again identified the letter and stated that he had attended the meetings of the advisory board of trustees and had firsthand knowledge of the action taken by that board. Over objection of Mr. French's counsel the letter and certified copy of the minutes were then offered and received in evidence.

In determining what matters are collateral and what are not, it has been suggested that the evidence be tested by whether it would be relevant for purposes other than the contradiction. McCormick and Ray, Texas Law of Evidence, 2d ed., Sec. 684, pp. 526–527; Hanover Ins. Co. v. Johnson, 397 S.W.2d 904, 906 (Tex.Civ. App.—Waco 1965, writ ref'd n. r. e.). Testimony as to the professional reputation of a physician in a malpractice action has generally been held inadmissible. 70 C.J.S. Physicians and Surgeons § 62, p. 999.

While the testimony of a physician witness may properly be rebutted by evidence tending to show that the witness is not qualified to give expert testimony on the subject, evidence that on other occasions the witness performed unnecessary operations or engaged in acts with which his peers disagreed or questioned, has generally been held inadmissible. Goodnight v. Phillips, supra; Johnson v. Myers, 118 Ga. App. 773, 165 S.W.2d 739 (1968), 33 A.L.R. 3d 1047. The witness may, however, be contradicted on a collateral matter if the matter, while not relevant in itself, is di-

rectly relevant to the subject of his testimony. Hanover Ins. Co. v. Johnson, supra; 98 C.J.S. Witnesses § 633, pp. 653–4.

■ The testimony of Dr. Ross, as a witness for the plaintiff, tended to establish his qualifications as a specialist in orthopedic surgery practicing in Austin, Texas. We do not believe it inappropriate that he was asked on cross-examination whether he was authorized to perform surgery at Breckenridge and other hospitals in Austin, Texas. By his response to the question he implied that he was authorized to practice surgery at that hospital, although not on the active staff. While it was competent for Dr. Ross to establish his qualifications by showing he was entitled to practice his medical specialty at various hospitals in Austin, Texas, this was also a legitimate subject of inquiry upon cross-examination. Whether he was authorized to perform surgery in the hospitals of his residence was a matter which tended to substantiate or refute his claim of medical expertise.

■ Having indicated to the jury that he was admitted to perform surgery at Breckenridge Hospital and, upon further inquiry, having denied that his staff privileges at that hospital had been removed, Dr. Ross raised a rebuttable issue on a matter directly bearing on his professional qualifications. It was not improper for Dr. Brodsky to offer contradictory evidence on this matter. Hanover Ins. Co. v. Johnson, supra; Missouri, K. & T. Ry. Co. v. Milam, 20 Tex.Civ.App. 688, 50 S.W. 417, 421 (1899, writ ref'd).

" . . . . When the existence of facts material to a plaintiff's case are put in issue by the defense, the truth of the testimony of witnesses to those facts is also put in issue; and evidence which has a tendency to show the untruth of such testimony is as relevant to the issues as testimony of other witnesses denying that the facts exist. As was said by Judge Stayton in Evansich v. G., C. & S. F. Ry. Co., 61 Tex. [24] 28: 'As all issues of facts must be determined by the testimony of witnesses, it would seem that any fact that bears upon the credit of a witness would be a relevant fact and this whether it goes to his indisposition to tell the truth, his want of opportunity to know the truth, his bias, interest, want of memory, or other like fact.'

"Evidence therefore which bears upon the story of a witness with sufficient directness and force to give it appreciable value in determining whether or not that story is true cannot be said to be addressed to an irrelevant or collateral issue. It is directed to the issue as to the existence of the material fact of which the witness has testified . . . " Gulf, C. & S. F. Ry. Co. v. Matthews, 100 Tex. 63, 93 S.W. 1068, 1070 (1906).

Had Dr. Ross, when asked whether he was admitted to perform surgery at Breckenridge Hospital, answered in the negative, this would have ended any legitimate inquiry on the subject and evidence tending to show that his privileges had been suspended would not, in our opinion, have been admissible. However, Dr. Ross's affirmative response left an implication with the jury that he was authorized to perform surgery at Breckenridge Hospital and that the only reason he was not on the active staff was that he had not made application. This testimony related directly to his qualifications as a medical expert in his field and tended to substantiate his testimony evidencing qualification to practice his medical specialty in the county of his residence.

The trial court has considerable discretion in determining the admissibility of evidence of this nature. Royal v. Cameron, 382 S.W.2d 335 (Tex.Civ.App.—Tyler 1964, writ ref'd n. r. e.). Dr. Ross's testimony indicates some reluctance on his part to respond directly and with candor to the examiner's inquiries as to his qualifications, and, considering the cumulative effect of his testimony we cannot say the trial court abused its discretion in allowing this evidence.

■ We are further of the opinion that if the trial court erred in admitting the evidence complained of, such error was not reasonably calculated to cause and probably did not cause the rendition of an improper judgment. Rule 434, T.R.C.P. While the testimony of Dr. Ross tended to raise a fact issue as to whether Mr. French had a herniated disc at the L3–4 levels at the time of the second or third operation, his testimony on that matter was not direct and unequivocal. In our opinion there was sufficient leeway in the testimony that the jury could have believed the truth of Dr. Ross's statements and have given weight to his medical expertise, and yet have determined from the evidence as a whole that a herniated disc was not present at the designated levels in Mr. French's back at the times specified.

The record establishes that the documentary exhibits (nos. 2 and 3) received in evidence with the testimony of Mr. Tobias were properly authenticated. This presents an entirely different situation than that in Purvis v. Johnson, 430 S.W.2d 226 (Tex. Civ.App.—San Antonio 1968, no writ), wherein excerpts from a letter regarding the physician's professional ability and integrity were not properly authenticated.

■ We are also of the opinion that the use in evidence of the records of the advisory board of Breckenridge Hospital was not prohibited by the provisions of Article 4447d, Tex.Rev.Civ.Stat.Ann. The provisions of that statute, when read in their entirety, show that the purpose of the legislation is to restrict unauthorized use of data pertaining to patients examined or treated by physicians, hospitals or other institutions or organizations covered by the Act. Moreover, no assertion was made by the hospital custodian that these records constituted privileged documents under the statute. We overrule points of error one through five.

In his sixth point of error French argues in effect that because Dr. Brodsky was permitted to offer impeachment evidence bearing on the credibility and medical expertise of Dr. Ross, he in fairness should have been afforded equal opportunity to offer evidence collaterally impeaching Dr. Brodsky's credibility and expertise. He contends the trial court erred in quashing subpoenaes for hospital and grievance records which he sought to obtain for use as "impeachment of Dr. Brodsky to discredit his alleged expertise as an orthopedic surgeon as to suspension or curtailment of his hospital privileges."

At the conclusion of the testimony, which covers some 800 pages of the statement of facts, the trial court indicated to counsel for Mr. French that he would be permitted to make his bill of exception with respect to his offer of evidence in impeachment of Dr. Brodsky's qualifications. Counsel announced that he had three subpoenaes outstanding and that there were then present in the courtroom the custodians of the records of the Harris County Medical Society and the Methodist Hospital, subject to their filed motions to quash their subpoenaes. In response to inquiry of the court, counsel stated that it was his "reasonable belief" that the Harris County Medical Society had records of complaints made by other patients of similar surgeries than those performed on Mr. French and that on one or more occasions Dr. Brodsky had appeared in connection with such complaints and that his reputation as being a qualified orthopedic surgeon might be "in doubt or dispute among his own peers." Counsel asserted that this was material impeachment testimony because of Dr. Brodsky's statement that he was "a member in good standing of the Harris County Medical Society." Counsel further stated his "belief" that the records of St. Luke's Hospital would show one or more reprimands or directives to Dr. Brodsky to cease certain medical and surgical practices and that the records of Methodist Hospital would indicate the surgical privileges of Dr. Brodsky at that hospital had been terminated due to the manner of his surgical procedures because of noncompliance with rules of the com-

mittee of that hospital and that such testimony was material as direct impeachment "of his surgical rights." Counsel further stated that "it may be that the Harris County Medical records in Dr. Brodsky's case include some information of testimony relative to his three surgeries" on Mr. French. Counsel admitted that he did not know what the subpoenaed records contained and that in the absence of looking at the records he could not state what they might show. At the conclusion of such statement by counsel the court refused to permit counsel to examine the two custodians as witnesses, but did ascertain to its satisfaction that the records contained no reference to the procedures performed on Mr. French. Based on counsel's statement, the court quashed the subpoenaes for such records.

■ On cross-examination as an adverse witness, Dr. Brodsky had testified that he practiced the specialty of orthopedic surgery. Upon examination by his own counsel, he testified that he graduated from the University of Maryland Medical School; that he did internship for a year in the Sinai Hospital in Baltimore; that he served in the U. S. Army during World War II and after release took a residency in urology and neuro-surgery in New York and elsewhere and that he was licensed to practice medicine in the State of Texas. He further testified that he was certified by the American Board of Orthopedic Surgery and was examiner for that board and that he was a member of the Harris County, Texas Medical, American Board of Orthopedic and American Academy of Orthopedic Surgeons. He stated he belonged to the Western Orthopedic, Texas Orthopedic, Houston Orthopedic and American Geriatrics Society, American Rheumatism Association, Texas Rheumatism Association and American Orthopedic Foot Society. Since Dr. Brodsky gave testimony in the case founded upon his medical expertise, we are of the opinion that his qualifications were subject to impeachment to the same degree as any other expert witness. How-

ever, we are further of the opinion, as previously expressed, that evidence showing only that complaints have been made or doubts expressed as to a physician's competency does not constitute proper impeachment of the witness's qualifications.

■ It should also be noted that there was no showing of any effort having been made prior to counsel's offer at trial to determine whether the records sought to be subpoenaed contained any admissible impeachment or rebuttal evidence. Counsel for Mr. French stated that he was not representing to the court that the subpoenaed records did contain evidence of the nature suggested but rather that it was his reasonable belief that they "may contain" such information. Counsel's offer did not point out which testimony of the witness he sought to impeach and under the state of the record much of the evidence, even if contained in the subpoenaed records, would have been inadmissible. Under all the circumstances we cannot say the trial court abused its discretion in quashing the subpoenaes and in refusing to permit inquiry of the custodians as to the contents of these records. Jack Cane Corp. v. Gonzales, 410 S.W.2d 953 (Tex.Civ.App.—San Antonio 1967, no writ); Singleton v. Carmichael, 305 S.W.2d 379, 384 (Tex.Civ.App.—Houston 1957, writ ref'd n. r. e.).

We overrule point of error number six.

In his seventh point of error French asserts the trial court abused its discretion in discharging Dr. Brodsky from the witness stand before his cross-examination had been completed and by making critical remarks in the presence of the jury with respect to plaintiff's counsel and as to the amount of time being expended in the trial.

The record shows that after Dr. Brodsky was in the second day of his examination by Mr. French's counsel, the court, following a brief recess, stated:

THE COURT: All right, Mr. Holloway, let's move along. 15 minutes with this witness and we ought to be finished.

MR. HOLLOWAY: Yes, Your Honor.

*Shortly thereafter the court commented:*

THE COURT: Move along, gentlemen.

At the conclusion of the initial phase of cross-examination of Dr. Brodsky the following occurred:

THE COURT: Are those all the questions of this witness? You are about an hour overtime, Mr. Holloway.

MR. HOLLOWAY: I understand that, Your Honor. Your Honor, we pass the witness.

After three days of testimony by Dr. Brodsky, who was extensively examined by counsel for both sides, the court sustained several objections to repetitious questions asked by Mr. French's counsel, and then inquired:

Are there any other different questions, now, material to any issue in this case that you may have of this witness? He has been on the witness stand now for two days, three days. I assume there are no further questions. Dr. Brodsky, you may be seated.

MR. HOLLOWAY: I am not completed

THE COURT: Call your next witness.

MR. HOLLOWAY: I have not completed my examination of this witness, Your Honor.

THE COURT: I asked you if you had any other different, relevant questions?

MR. HOLLOWAY: I am looking at the record to find out what additional questions. I have not completed interrogation of this witness, Your Honor.

THE COURT: All right, state your question.

MR. HOLLOWAY: If the witness is on the stand.

THE COURT: State your question so I can determine whether it's relevant and whether it's different than what you

have been asking him for the last three days.

After a brief additional colloquy between the court and counsel the jury was retired and the court directed Dr. Brodsky to return to the witness stand and Mr. French's counsel to make his bill of exception. The court stated:

Bill of exception will be now for you to ask questions of this witness that have not already been asked him in the last three days. You have a constitutional right to ask a witness questions. That's true. You have no right to take up the time of twelve citizens of Harris County and this court in asking repetitious questions. Doctor, I ask you to be very brief with your answers. Yes or no, if at all possible. Go ahead, Mr. Holloway.

MR. HOLLOWAY: Thank you, Your Honor.

Counsel for Mr. French then proceeded to ask Dr. Brodsky a series of questions relating to the disability rating of Mr. French as a result of the operation. At the conclusion of this questioning, the jury was returned and counsel was permitted to go over these and other questions in further examination of Dr. Brodsky. At the conclusion of this testimony the court discharged the witness over further objection that counsel had not completed his cross-examination, the court stating that counsel would be permitted to complete his bill of exception after the jury retired that evening. The record indicates that Dr. Brodsky was not excused as a witness but instructed to remain in attendance so that Mr. French's counsel might complete his bill of exceptions, although the court further indicated it would not permit a mere "fishing expedition" with respect to the impeachment matters which we have discussed above.

 While cross-examination should not be restricted merely because a great deal of time will be required, the trial court

may limit the scope and extent of further cross-examination where it has become unduly protracted and repetitious. Kollenborn v. Kollenborn, 273 S.W.2d 660, 664 (Tex. Civ.App.—Forth Worth 1954, writ dism'd). The record reflects that the trial court afforded Mr. French's counsel considerable latitude in his examination of Dr. Brodsky and in the absence of showing in the statement of facts or by bill of exception that he had further legitimate inquiry to make of Dr. Brodsky, and that he was prejudiced by the trial court's actions, we cannot state that the trial court abused his discretion in this respect. Reserve Life Insurance Co. v. Martin, 312 S.W.2d 321 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n. r. e.).

Counsel for Mr. French further argues that he was repeatedly criticized by the trial court in the presence of the jury and that the court's demeanor showed impatience with both counsel and the facts of the case to such a degree that his client's rights to a fair trial were prejudiced.

■ A trial judge should avoid verbal controversies with counsel in the presence of jury and should not express or display personal attitudes of impatience or displeasure toward either counsel. However, the general conduct of the trial is the responsibility of the trial judge and he may properly intervene to promote its expedition and prevent unnecessary waste of time. McDonald, Texas Civil Practice, Vol. 3, rev. 1970, Sec. 11.20.1, p. 198.

■ In several instances the remarks of the trial judge may have created an impression in the minds of the jury that he was impatient, and perhaps somewhat agitated, by the manner in which counsel was conducting his case. While this is a regrettable situation in any case, the record reflects that counsel was not inexperienced and that he to some degree invited and contributed to the court's growing concern over the conduct of the trial. The record is devoid of any evidence that the trial court entertained or displayed any bias or prejudice against Mr. French or his counsel and it is quite obvious that the trial court's remarks were directed solely to the orderly process of the trial. In similar situations, actions of the trial court have been held not to constitute reversible error. Hill v. Budget Finance & Thrift Co., 383 S.W.2d 79 (Tex.Civ.App.—Dallas 1964, no writ hist.); Runyon v. City of Brownsville, 371 S.W.2d 924 (Tex. Civ.App.—San Antonio 1963, writ ref'd n. r. e.).

We believe the matters complained of under French's seventh point of error rest within the discretion of the trial court, and we do not find that the trial court abused its discretion in the respects noted. Texas Mexican R. Co. v. Bunn, 264 S.W.2d 518 (Tex.Civ.App.—San Antonio 1953, writ ref'd n. r. e.); Leatherwood v. Holland, 375 S.W.2d 517 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n. r. e.).

■ The eighth point of error of Mr. French is that the trial court abused its discretion in admitting in evidence certain deposition testimony of Dr. Alexander Gol, who assisted Dr. Brodsky in the third operation on Mr. French's back, contending that Dr. Gol was erroneously permitted to give his expert opinion on the ultimate fact of negligence. We are unable to find that this point of error is germane to any assignment of error in French's motion for new trial and we are therefore without authority to consider this point. Rules 374 and 418, Texas Rules of Civil Procedure; Nixon v. Nixon, 348 S.W.2d 438 (Tex.Civ. App.—Houston 1961, writ dism'd).

In his points of error 9 through 11 Mr. French contends the trial court erred in refusing to permit the filing of his trial amendment and in refusing to properly define the terms "herniated disc," "ruptured disc" and "surgically explored."

Mr. French proceeded to trial upon his original petition which alleged that Dr. Brodsky had failed to discover and remove a herniated disc on the occasion of the two previous surgeries.

Dr. Richard H. Eppright, who consulted with Dr. Brodsky with respect to Mr. French's third operation, testified that a "herniated" disc is one in which a hole has developed in the posterior longitudinal ligament. He testified that a disc might protrude without rupturing but that a herniated disc is one which has protruded and then ruptured. He stated that after a protruding disc has ruptured, it is no longer protruded because like a burst balloon, there is a hole through which the disc material leaves its normal space. Dr. Eppright further testified that the terms "herniated" or "ruptured" might be used interchangeably, the latter being a lay term for a herniated intervertebral disc. Dr. Eppright testified that he had not heard the term "offending disc" used in medicine.

Dr. Brodsky described a herniated disc as follows:

"A disc is a gristle-like substance which is like the cushion between two vertebrae. There is one between each of the two vertebrae, up and down the spine. It's held in space by ligaments all around it. And when a disc herniates, it means that first it changes its interior consistency, becoming more fluid and more what we call sequestrated. It bulges. The ligament has to stretch or tear, and then a bulge takes place. That bulge can be, well, of different kinds. It can be a diffused bulge or it can be a localized knot, or the ligament may tear and a piece of ruptured disc may come out, like cooked crab meat may through the hole, either part way out the hole and all the way out the hole, and when that happens we call it ruptured.

"If it bulges or has a blister on it or a protrusion, we call it herniated."

Dr. Ross testified that the terms "bulging," "herniated" or "ruptured" were different words for the same condition and that when this condition produced symptomatology this might be called "offending." He further testified that a ruptured disc degenerates and that the rate of de-generation varies from individual to individual and to the degree of the trauma or rupture.

After several days of trial Mr. French sought to file trial amendment expanding upon the description of the disc as including a "ruptured, herniated, extruding, offending, protruding or damaged intervertebral disc." The trial court refused to permit the filing of this trial amendment but did instruct the jury as follows:

" . . . the Court will permit Mr. Holloway to use the term protruding disc with the understanding that that will mean approximately the same as a ruptured or herniated intervertebral disc with the qualification as the Court understands, that a person may have a protruding intervertebral disc which would cause pain and which would require surgical repair even though that disc were not ruptured or herniated."

"MR. HOLLOWAY: I understand."

The issues submitted to the jury inquired as to whether Mr. French had a "herniated disc" on the dates of the last two operations. Mr. French objected to the court's charge because it did not define the term "herniated disc" or "ruptured disc" and requested instructions as follows:

"By the term 'herniated disc', as used in this charge, is meant a protrusion or extrusion of the disc from its natural cavity or confines of the body into an abnormal space in the body so that the disc, or some part thereof, impinges, compresses upon or presses against one or more nerves which affect the right leg, buttock, or lower back area of the patient as to cause pain, discomfort, weakness, loss of sensation, or other damage to the right leg and back or buttock area of the patient; or, by the protrusion or extrusion or rupture or damage to the intervertebral disc center, the nucleus pulposus, so as to cause disc pressure or compression of the nerves, one or more, which affect the patient's right leg, buttock, and thigh."

"You are instructed that by the medical term 'ruptured disc' and as that term is used in the Court's charge, is meant either (a) a rupture of the disc material through its natural casing so that the disc material protrudes outside of the casing of the disc and causes pressure on the nerve roots, (b) a protrusion of the disc itself outside of its usual place which it normally occupies in the Plaintiff's body so as to cause pressure on a nerve root, (c) a rupture or herniation of the nucleus pulposus (center fibers of the disc) outside of its normal confines so as to cause the disc itself to extrude or protrude outside of its normal confines within the body and cause pressure on one or more nerve roots, or (d) any protrusion or extrusion of the disc outside of its normal place in the body due to a disease or other damage of the fibers of the disc so that the disc in such extrusion or protrusion from its normal place causes nerve root pressure or irritation."

█ We are of the opinion that the proposed trial amendment attempting to further define the nature of the alleged disc injury and the instructions sought by Mr. French with respect to the terms herniated disc and ruptured disc, may have tended to confuse rather than clarify the nature of the plaintiff's claim and the expert medical testimony received on the subject. The plaintiff's suit was based upon the premise that Dr. Brodsky had failed to diagnose a herniated disc at the L3–4 level. The court's instruction tended to harmonize the definitions given by the medical experts and we cannot say the trial court abused its discretion in refusing to give subdivisions of its definition of the term. McDonald, Texas Civil Practice, Vol. 3, rev. 1970, Sec. 12.14.3, pp. 328–331. Mr. French also objected to the court's charge for its failure to incorporate his requested definition of "surgically explored" as follows:

"By the term 'surgically explored', as used in this charge, is meant a procedure by which an orthopedic surgeon, in the exercise of ordinary care and prudence, in order to confirm or disaffirm a surgical necessity to remove a portion of a disc causing symptoms or a nerve root compression, could adequately observe and detect the probable damage, both internally or externally, of a disc causing symptoms or nerve root compression as a result of the disc, or any part thereof, being out of its usual and normal place in the body of the patient."

█ In our opinion the term "surgically explored" did not require legal definition and under the evidence we believe the term must have been clearly understood by the jury. The trial court has considerable discretion in determining what explanatory instructions are necessary or proper in the submission of its charge and we believe it acted within the bounds of its discretion in refusing the requested instructions. We are also of the opinion that Mr. French failed to show that the error complained of under these points "amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case." Rule 434, T.R.C.P. We overrule Mr. French's points of error 9 through 11.

██ In his remaining points of error 12 through 17 French asserts that the uncontroverted evidence (points 12, 14 and 16) showed that he had a herniated disc at the L3–4 level at the times of the second and third operations and suffered some damages, and (points 13, 15 and 17) that the jury's negative responses to the special issues are against the overwhelming weight and preponderance of the evidence. Each of these points is directed to the trial court's asserted error "in denying a new trial" and Dr. Brodsky asserts that all such points must be considered as a test of the factual sufficiency of the evidence, citing Keith v. Ledbetter, 431 S.W.2d 433 (Tex.Civ. App.—Amarillo 1968, writ ref'd n. r. e). We find that case to be procedurally distinguishable because there each of the points was duplicitous, presenting both a

fact and a law complaint under a single point. In the case at bar French's fact and law points are separately stated. In Rosas v. Shafer, 415 S.W.2d 889 (Tex. 1967), the Supreme Court held that legal sufficiency complaints can be made for the first time in a motion for new trial. See also last sentence Rule 279, T.R.C.P. Since the appellant can assert a law complaint for the first time in a motion for new trial, he can properly complain of the error of the trial court in overruling his motion for new trial on the ground that his law assignment was meritorious. A mere reference to the overruling of a motion for new trial, therefore, will not transmute an otherwise properly worded law point into a fact point. O'Connor, Appealing Jury Findings, 12 Hous.L.Rev. 65, 76 n. 57 (1974). However, if the point of error in the brief is directed only to the asserted error of the court in overruling motion for new trial, the appellate court can only remand and cannot render the case if the point is sustained. J. Weingarten, Inc. v. Razey, 426 S.W.2d 538, 540–41 (Tex. 1968).

■ Since we have concluded that these points test both the factual and legal sufficiency of the evidence, we have reviewed the entire record in making our determination. In his statement under these points, Mr. French indicates that the sole inquiry here is whether the evidence "as a whole" shows that he did in fact have a herniated disc at the L3–4 level at the time of the second or third surgical procedure. Thus, we review the medical testimony on these issues.

Dr. Brodsky first operated on Mr. French in the fall of 1967 for a herniated disc at L4–5 level and possibly at the L5–S1 level. He testified that the evidence indicated nerve root compression "most likely due to a herniated disc or discs," and that the purpose of that surgery was to do a laminectomy to take the pressure off the nerves and possibly a spinal fusion, depending upon the findings at the time of surgery. He intended at that time to explore two interspaces of the spine. He testified there was no clinical indication or myelographic evidence of a herniated disc at the L3–4 level and that he would have considered it quite improper to have conducted an exploratory operation at that level.

After French was discharged he returned for examination in October and again in December, 1967, and these examinations indicated no pain or other symptom indicating that his recovery was not satisfactory. Mr. French returned in February stating that he had fallen at home and had developed a lower back pain on the opposite side of his previous surgery. The fusion appeared to be somewhat solidified and Dr. Brodsky stated that he was somewhat optimistic, "hopeful that the fall didn't harm him very much." About a week later French returned and Brodsky noted that he was "radiating pain into his right leg and to the ankle."

On June 11, 1968 French returned to Dr. Brodsky and stated he was having increased pain in the right side of his low back and down his right leg. Tests showed restriction of back movement and pain on various portions of his right side. Dr. Brodsky gave hip injection, ordered physical therapy and prescribed some medication and saw him a week later on June 18, 1968. This examination produced essentially the same information and therapy did not seem to be productive.

Mr. French was admitted to the hospital by Dr. Brodsky on June 23, 1968 and his second operation took place on June 29, 1968. Based upon the clinical information and a myelogram taken by Dr. Teng, the interspace between L–4 and 5, on the right side (opposite the same interspace previously explored in the first operation on the left side), was explored and a herniated disc was discovered "sufficiently large to produce a marginal defect." This disc, incidentally, was not apparent on the previous myelogram. Dr. Brodsky stated that in his opinion there was a sufficient protrusion of this material from this disc to

have caused Mr. French's right sciatic nerve pain.

Dr. Brodsky testified that prior to the second surgery the clinical evidence indicated a pinched nerve in Mr. French's back on the right side. He stated, however, that there were not enough neurologic findings to tell him at which level, until he reviewed the myelogram. He said he felt that the possibility of the pain being caused by the herniated disc at L3 was "totally ruled out by the myelogram." He said he did, however, explore the interspace L5–S1 on the right side because lateral herniations are less likely to show at that level and that the highest percentage of errors of negative myelograms occurred at that lower level. He concluded that "preoperatively the reasonable probabilities were overwhelmingly such that an L3 disc was not a likely thing."

Mr. French was discharged from the hospital on July 7, 1968 and in August, 1968 was examined at Dr. Brodsky's office. His wound had healed and the x-rays "looked good" but he showed signs of being extremely nervous and upset. On September 16, Mr. French returned and stated he had been having increased pain "since he had done an awful lot of driving while on the job." Limited movement tests and x-rays showed no remarkable abnormality but Mr. French was having pain and felt bad and Dr. Brodsky decided he should again be hospitalized. Mr. French complained of having pain in his lower back and down his leg to just below his right knee. Dr. Brodsky asked for psychiatric consultation on the possibility that Mr. French's pain and illness were emotionally caused. Mr. French was discharged from the hospital on September 21, 1968 without specific treatment of his back or leg complaints.

Dr. Brodsky next examined Mr. French on October 7, October 18 and November 1, and on November 3 French was again hospitalized because of his "persistent pain in the right lower extremity emanating from his back." A myelogram was done before surgery and the report of Dr. Wagner dated November 4, 1968 indicated that a small defect at the L3–4 region had been seen in the area previously. Dr. Brodsky explained that the defect that Dr. Wagner saw in the film was there before but that he, Dr. Brodsky, and Dr. Teng, who had done the prior myelograms, considered this unimportant. Dr. Brodsky testified that there was a "slight retrolesthesis" at that level and that it was not a disc defect. Dr. Brodsky further testified that he gave enough credibility to Dr. Wagner's professional status that he explored the interspace in his third surgical operation and found it to be normal. On this point he testified as follows:

"Well, sir, this gentleman had a complex problem. He had pain. He had been operated on previously. It was a difficult diagnostic problem and I tried to leave no stones unturned and even though I didn't think that this was a significant defect I did look at it, sir, and I verified my previous opinion and Dr. Teng's previous opinion that it was not significant."

Dr. Brodsky testified that during the third surgical procedure he explored L5–S1 on the right side and found bulging, soft tissue, degenerated with some compression of the S1 root and that at the L4–5 level just above it, where there had been a previous removal of the disc, there was a "definite hard projection which proved to possess a moderate amount of disc material." Dr. Brodsky testified that the fifth lumbar root at that point was "bound down" in scar tissue and adhesions to the disc and to the lateral wall of the bony canal. He stated that the nerve was compressed in the intervertebral foramen which is the canal the nerve travels through to get out of the spine into the soft tissue; that he "freed that up." He testified that he then looked at the L3–4 interspace and the disc there was found to be "within normal limits" and he also looked at the fourth lumbar root that runs over the third disc and found it to be normal. He said that the L3–4 disc was not herniated and was not unduly

soft and this confirmed his interpretation of the myelogram that this was not "a significant defect."

Prior to the third operation in November, 1968, Dr. Brodsky had consulted with Dr. Eppright, an orthopedic surgeon and professor in orthopedics at the Baylor College of Medicine. Dr. Eppright reviewed Dr. Teng's 1968 myelographic film taken prior to the second operation and testified they did not indicate a ruptured or protruded disc at the L3–4 level. Dr. Eppright's recommendation was a re-exploration of L4–5 and L5–S1 and if exploration of those areas were not revealing, exploration of the L3–4 interspace. He testified that it was not difficult to determine on visual examination whether a disc is herniated or not.

Dr. Brodsky also conferred with Dr. Alexander Gol, a neurosurgeon, prior to the third operation. Dr. Gol examined Mr. French on November 6, 1968 and diagnosed "multiple nerve root compressions" in the lower lumbar region "probably in the L5–S1 distribution of the right side." Dr. Gol then participated with Dr. Brodsky in the operation describing the procedure as follows:

"The decompression was carried out at three levels, and the nerve root decompression was performed particularly at L5 level nerve root, which was decompressed. It was felt at the end of this procedure that a very adequate decompression had been carried out, both from the point of view of bony changes and previous scarring. Some further disc material was removed from the L4–5 level at the same time."

Dr. Gol testified the L3–4 level was also explored and that he was satisfied that everything was properly done during the surgery.

Dr. Ross first examined Mr. French in February, 1974. At that time he made x-rays which indicated new bone formation and narrowing of the intervertebral disc space at the L3–4 level. He testified that the symptomology of the patient indicated that "perhaps he did have three disc lesions at the same time" and that he would be inclined to suspect that Dr. Brodsky had failed to remove a disc at the L3 level during the first operation. He testified, however, that on the first operation he would probably have been hesitant to explore the L3 interspace in the presence of the physical findings and the myelographic report and certainly upon finding "a big disc" at L4 and a degenerated disc at L5. He said he could find no fault with the first surgery since it did resolve the severe pain in French's leg and French "did real well" after that operation.

In connection with the second surgery Dr. Ross testified that it was common practice to explore the disc above and below the area of the questionable lesion. He said Dr. Brodsky's second surgery was questionable because the myelogram was inconclusive and the physical findings were not of a localizing nature, so therefore a physician would be obliged to go above and below "to see for certain." He testified that orthopedic surgeons did this to avoid unnecessary surgery the next time. He said that Dr. Brodsky's failure to make such additional exploratory surgery was the reason the third operation had to be done. He testified that the fact that the patient's symptoms were unrelieved after the second operation indicated that Dr. Brodsky had failed to remove all of the protruding disc material existent in the lumbar spine. He said the fact that the symptoms were not alleviated by the June, 1968 operation indicated a herniated disc at the L3–4 interspace. He said the myelogram taken prior to the second surgery showed an abnormal disc condition at the L3–4 level and that he would be obliged to look at the third level "mainly because of the myelographic defect and because of the surgeon's uncertainty of where the painful provocation started."

Dr. Ross concluded that since the x-rays showed an abnormal disc at the L3–4 level Dr. Brodsky did not have "the capacity" to recognize it as such and that it should

have been removed. At another point in his testimony Dr. Ross was unwilling to suggest that Dr. Brodsky was not competent to recognize a ruptured disc when he saw one during surgery. He testified that the only evidence of a ruptured disc at any level in June, 1968 was the myelogram and that the radiologist's failure to report a defective or abnormal disc at L3–4 in the June, 1968 myelogram was an exercise of his professional judgment. Dr. Ross stated that he could not diagnose a ruptured disc at the L3 level based entirely upon what he could see in the record concerning symptoms and clinical findings with respect to either the June, 1968 or November, 1968 operations.

It would serve no purpose to review the respective qualifications of the physicians who testified nor to point out those aspects of the testimony of Dr. Ross which could account for the jury's failure to give greater weight to his conclusions. Suffice it to say that the jury was at liberty to accept the medical views of Drs. Brodsky, Eppright and Gol, and to reject views to the contrary. We find the testimony to be conflicting on the issues as to whether a herniated disc existed in Mr. French's back at the L3–4 level at the time of the second or third operation and we further find that the jury's negative findings on such issues are not against the great weight and preponderance of the evidence.

Mr. French's points 12 through 15 are overruled.

We also overrule Mr. French's points 16 and 17. No objection was leveled at the manner of the submission of the damage issue and in view of our holding that Mr. French failed to prove the existence of a herniated disc at the time of either of the two operations, there is no question of damages in the case. Southern Pine Lumber Co. v. Andrade, 132 Tex. 372, 124 S.W.2d 334 (1939).

The judgment of the trial court is affirmed.