Jonathan David DREW, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–99–01323–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 14, 2002.

Discretionary Review Refused June 26, 2002.

Terri R.Z. Jacobs, Jack B. Zimmerman, Houston, for appellant.

Rikke Burke Graber, Houston, for appellee.

Panel consists of Justices YATES, ANDERSON, and SEYMORE.

## OPINION

CHARLES W. SEYMORE, Justice.

Appellant Jonathan David Drew appeals his conviction and life sentence for felony murder. We affirm.

### I. BACKGROUND

On November 29, 1998, complainant Tina Flood and her friend Justin Chapman attended a birthday party at a bar in Seabrook, Texas. Appellant was introduced to Tina at the party. He bought her drinks, and they were seen kissing. When the bar closed and the party ended at 2:00 a.m., several people went to a Holiday Inn hotel. Because Tina was too intoxicated to drive to the hotel, she and Chapman rode there with other people. Her car was left in parking lot next to the bar. When they attempted to check into their room, Chapman, who was a Holiday Inn employee, realized he had left his employee discount card in Tina's car. They saw appellant sitting in his pickup truck in the hotel parking lot and accepted his offer to take them back to the bar. Tina sat in the middle next to appellant, and Chapman sat in the passenger's side of the front seat.

When they arrived at the parking lot next to the bar, Chapman exited appellant's truck and held Tina's purse while she exited the truck. According to Chapman's testimony, Tina was attempting to scoot across the seat to the passenger-side door when appellant drove away. Chapman was between the open door and the body of the truck and held onto the door as appellant drove away. Chapman testified that Tina screamed for appellant to stop. As the truck pulled out of the park-

ing lot, the door slammed shut and knocked Chapman into a ditch. Chapman ran to the bar and began beating on the front door.

At 2:52 a.m., Seabrook Police Officer Marc Hatton was on patrol when he saw Chapman beating on the bar's door. Chapman told Officer Hatton that his friend had just been kidnapped. Chapman described a maroon, full-sized, single-cab Chevrolet truck. The description of appellant's truck was broadcast to other officers in the area. At 3:49 a.m., Harris County Deputy Constable Sean Kitchens spotted appellant's truck, and he was stopped for failing to maintain a single lane of traffic. Deputy Kitchens asked appellant for his license. When appellant leaned over to retrieve his license from the console, Kitchens noticed a bloody foot lying on the seat. When asked who that was, appellant responded, "That's my friend Tina. She's knocked out over there." Tina was lying in a fetal position against the passenger's door, naked except for her skirt, which was bunched around her waist. She had abrasions on her leg, buttocks, and arm. Deputy Kitchens called for backup assistance. After the backup arrived, appellant was asked to step out of the truck. Deputy Kitchens noticed a scratch on appellant's right arm, three scratches on the back and side of his neck, and what looked like blood on his shirt collar.

Tina was taken to the Clear Lake Regional Medical Center. Emergency Room Nurse Christine McFall conducted a sexual assault examination. According to McFall, Tina repeatedly stated, "Please help me. Please help me. Don't hurt me." Emergency Room Nurse Mary Jane Heady heard Tina state, "Please don't rape me." A CAT scan showed that Tina had sustained a skull fracture, which caused her brain to swell and hemorrhage. Surgery was performed, but Tina died a day

and a half later because swelling in her brain. The State tried appellant for capital murder, however, the jury found him guilty of felony murder, and he was sentenced to life in prison.

## II. ISSUES ON APPEAL

Appellant brings nineteen issues in this appeal, asserting (1) the evidence supporting his conviction is legally and factually insufficient; (2) the trial court erred in denying him the right to confront two witnesses; (3) he was denied due process and due course of law by the State's failure to disclose the probation status of two witnesses; (4) the trial court erred in admitting gruesome and unnecessary autopsy photographs; (5) the trial court erred in failing to instruct the jury about the required culpable mental state for felony murder; (6) the trial court erred in failing to require a unanimous jury verdict on the underlying felony in order to convict him of felony murder; (7) the trial court erred in admitting Tina's hearsay statements; (8) the trial court erred in denying his motion to reopen voir dire; (9) the trial court erred in overruling his objection to the prosecutor's argument, which injected new and harmful facts into the case; and (10) the trial court erred in overruling his objection when the prosecutor, during final argument, injected his personal opinion that appellant committed an extraneous offense.

## III. LEGAL & FACTUAL SUFFICIENCY

In his first two issues, appellant claims the evidence is legally and factually insufficient to establish either the underlying offense of kidnapping or aggravated sexual assault or the commission of an act clearly dangerous to human life. When reviewing the legal sufficiency of the evidence, we must view the evidence in a light most favorable to the verdict and deter-

mine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Wilson v. State,* 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). In conducting this review, we do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure that the jury reached a rational decision. *Muniz v. State,* 851 S.W.2d 238, 246 (Tex.Crim.App.1993).

In reviewing the factual sufficiency of the evidence, we view all the evidence in a neutral light, both for and against the finding, and set aside the verdict only if "proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim. App.2000). We review the fact-finder's weighing of the evidence and are authorized to disagree with the fact finder's determination. *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996). Our review, however, must be appropriately deferential so as to avoid substituting our own judgment for that of the fact-finder. *Jones v. State,* 944 S.W.2d 642, 648 (Tex.Crim.App.1996).

Chapman testified that appellant drove away as Tina was attempting to exit his truck. It appeared to Chapman that appellant was holding onto her. Chapman heard her scream for appellant to stop as he drove away. Although Chapman tried to hold onto the truck door, he was thrown to the ground. Officer Haddon, the police officer who found Chapman beating on the door of the bar for help, testified that Chapman's pants were covered in mud and that he was almost hysterical.

When Officer Kitchens pulled appellant's truck over, he found Tina curled in the front seat naked, unconscious, bloody, bruised, and scraped. Appellant had a long scratch on his arm, scratches on his neck, and what looked like blood on his collar. A search of the car revealed a pair of men's underwear, Tina's underwear, and her blouse.

The forensic evidence shows that Tina's injuries were extensive. Dr. Paul Schrode, the medical examiner who performed the autopsy, testified there were at least two distinct fractures to Tina's skull, the result of one or possibly two separate acts of blunt trauma. He stated that a considerable amount of force was required to cause those fractures. Next, Dr. Schrode testified there was an abrasion on the back of Tina's head and a bruise on the back of her brain immediately below the point of impact. On the opposite side of her head, there was a massive amount of bleeding, but no external bruise on her skin. Such an injury is typically found where a moving head strikes a stationary object. Dr. Schrode stated the injury to Tina's skull was consistent with her moving head striking a stationary object.

Dr. Schrode also testified that Tina's ear was swollen and that there was a bruise behind the ear. He stated that, while this bruise could be related to the skull fracture, swelling of the ear indicated the injury was probably caused by a separate impact. According to Dr. Schrode, the injury to Tina's ear was more consistent with something striking her or her head striking something on that side.

Regarding the abrasions and contusions on Tina's shoulder, shoulder blade, elbow, lower back, and buttocks, Dr. Schrode testified they were consistent with being dragged on a rough surface, such as concrete. He also described a wrinkling or crumpling of the skin on Tina's back, which suggests that something scraped

across her back, consistent with the skin having been stepped on. Dr. Schrode further stated Tina's abrasions were not consistent with those that might result from jumping out of a moving vehicle.

Dr. Schrode also found bruising in the soft tissue of both sides of Tina's neck. He testified this was caused by direct external compression, often seen in manual strangulations. Further, there were small oval contusions on Tina's lower legs, ankles, and upper right arm, consistent with finger impressions. Dr. Schrode also observed abrasions on Tina's knuckles and the meaty part of the thumbs of both hands, suggesting defensive injuries. The evidence showed appellant had scratches on his right arm and neck.

The anal swabs taken during the sexual assault examination contained a mixture of DNA from appellant and Tina. While there were no obvious abrasions or tears in the vagina and anal area, Dr. Schrode testified the area was a little darker than normal, which suggests, but does not confirm, trauma. He did not cut into the area to determine whether there was any bruising underneath the skin. While bruising around the vaginal or anal area is usually an indication of sexual assault, he has performed autopsies in cases where there has been an alleged sexual assault, but no bleeding, tearing, or abrasions.

Appellant contends there is no evidence that he struck Tina or that he caused her head to strike a stationary object; instead, Tina could have sustained injuries before leaving the party, from accidentally falling over backward, or falling out of the truck. Although Tina had been drinking, the testimony showed that Tina was not "falling on her face drunk" and that she was able to "function and walk." Moreover, two or three distinct traumas to Tina's head supports an inference her injuries were not sustained as a result of a single accidental fall. Further, Tina's hand injuries and appellant's scratches indicate that she defended herself. Also, the evidence showed that Tina did not go with appellant willingly. Finally, no evidence showed that Tina sustained any of her injuries before she was alone with appellant, particularly her life-ending skull fractures.

After reviewing the evidence in a light most favorable to the verdict, we find the evidence is legally sufficient to support the underlying offenses of kidnapping and aggravated sexual assault and the commission of an act clearly dangerous to human life.

· Appellant called two witnesses in his defense, Dr. Linda Norton and John Opiala. Dr. Norton, a forensic pathologist, agreed with Dr. Schrode's conclusion that Tina sustained her skull fractures and abrasions when her moving head struck a stationary object. Dr. Norton concluded those injuries were not sustained as the result of an assault, but happened when an intoxicated Tina fell backward, hit her head on the ground, and then slid a short distance. Dr. Norton testified that she has encountered multiple cases in which an intoxicated person has fallen backward and struck a hard surface with sufficient force to cause similar head injuries. Dr. Norton admitted, however, it was possible that Tina sustained the head injury when she was slammed against an object and dragged for a distance. As to the injuries to Tina's hands, Dr. Schrode explained alternatively that a person could sustain those injuries by catching herself against a hard surface when falling.

Dr. Norton also attributed bruising of the tissue in Tina's neck to such medical intervention as the insertion of a breathing tube. Even Dr. Schrode, when testifying that such bruising is often seen in manual strangulations, cautioned, "I don't want to

suggest that she was manually strangled because I don't have any other signs."

Dr. Norton testified that in her review of the sexual assault report, the hospital records, and the autopsy report, she found no evidence of any injury or trauma to the anal and vaginal areas. However, on cross-examination, Dr. Norton stated that lack of injury does not eliminate the possibility of sexual assault. With respect to color variation in Tina's genital region, Dr. Norton stated such variation is normal.

Appellant complains the only evidence of abduction was Chapman's "discredited" testimony. Appellant, without citation to the record, states Chapman "told the police different stories, admitted he would lie to the jury, and absconded during trial after his probation status was discovered." Appellant also called John Opiala, a manager of a bar, to testify that Chapman had a reputation for untruthfulness. Apparently, Opiala's opinion of Chapman's reputation was based on Chapman's alleged attempt to use false identification when dealing with a waitress in Opiala's bar. Opiala could not, however, remember the waitress's name or any other person with whom he had spoken about Chapman's reputation for untruthfulness.

The State and appellant presented the jury with conflicting theories of how Tina sustained her injuries. It is the jury's duty, as the fact-finder, to determine the weight and credibility to give any testimony. Because we find the record does not reveal that a different result is warranted, we must defer to the jury's determination regarding the weight given to, and the credibility of, controverted testimony. *See*

*Johnson,* 23 S.W.3d at 8. We do not find the "proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or ... is greatly outweighed by contrary proof." *Id.* at 11. Accordingly, we hold the evidence is factually sufficient to support appellant's conviction for felony murder. Appellant's first and second issues are overruled.

### IV. FAILURE TO DISCLOSE

 In his seventh, eighth, ninth, and tenth issues, appellant claims he was denied due process and due course of law by the State's failure to disclose the probation status of Justin Chapman[1] and the deferred adjudication probation status of Ruffini. The prosecution has an affirmative duty to disclose all material evidence favorable to the defense. *McFarland v. State,* 928 S.W.2d 482, 511 (Tex.Crim.App. 1996) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Both impeachment evidence and exculpatory evidence are within the scope of the *Brady* rule. *Wyatt v. State,* 23 S.W.3d 18, 27 (Tex.Crim.App.2000) (citing *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The prosecutor violates the Due Process Clause of the Fourteenth Amendment when he fails to disclose material evidence that is favorable to the accused. *Thomas v. State,* 841 S.W.2d 399, 404 (Tex.Crim.App. 1992). "*Brady* has been extended to include the required revelation to an accused of material exculpatory evidence in the possession of police agencies and other parts of the 'prosecutorial team.'" *Ex*

---

1. The trial court granted appellant's pretrial motions requesting criminal backgrounds on all the State's witnesses, including pending charges and information relevant to potential bias. On the final day of trial, during punishment, appellant's trial counsel announced he had just learned that Chapman was on probation. The prosecutor responded that he was unaware of this. After investigating the matter, the prosecutor confirmed that Chapman had been placed on probation for misdemeanor driving while intoxicated in another county on May 4, 1999, after he had given his statements to the police regarding this case.

*parte Mitchell,* 977 S.W.2d 575, 578 (Tex. Crim.App.1997) (citing *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). The prosecutor, however, has no duty to turn over evidence that would be inadmissible at trial. *Lagrone v. State,* 942 S.W.2d 602, 615 (Tex.Crim.App.1997). The three-part test used to determine "whether a prosecutor's actions have violated due process is whether the prosecutor (1) failed to disclose evidence (2) favorable to the accused and (3) the evidence is material, meaning there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Little v. State,* 991 S.W.2d 864, 866 (Tex. Crim.App.1999).

Appellant contends the facts of this case satisfy the three-part test because the prosecutor failed to disclose Chapman's and Ruffini's probation status—evidence which was favorable to him. Appellant contends that his inability to cross-examine Chapman about possible bias undermined confidence in the outcome of the trial. Appellant asserts that Chapman's testimony was the only evidence supporting the kidnapping offense and the only evidence controverting testimony from the State's other witnesses that Tina and appellant had been enjoying each other's company at the party. Likewise, with regard to Ruffini, appellant asserts that her deferred adjudication probation would have caused the jury to view differently her unreported and uncorroborated account of sexual assault by appellant.

■ We disagree that Chapman and Ruffini's probationary status was material, i.e., created a probability sufficient to undermine confidence in the jury's verdict. *See Thomas,* 841 S.W.2d at 404. In making this determination, we have examined the alleged error in the context of the entire record and in context of the overall strength of the State's case. *Id.* Chapman received one year's probation in a different county for a misdemeanor; his offense occurred several months after Tina's death, but before appellant's trial. In the context of the record, the value of this misdemeanor probation in showing bias is slight. Chapman's account of Tina's kidnapping to police soon after appellant drove away with her is consistent with his trial testimony. Additionally, the other evidence, much of which we have already detailed, is strong proof that Tina suffered extreme violence at appellant's hands. We are convinced that Chapman's probationary status is insufficient to undermine confidence in the outcome of the trial.

■ Similarly, Ruffini's deferred adjudication probation for credit card abuse and outstanding warrant for failure to complete her probation was not material. Ruffini testified that appellant, her neighbor, raped her when she was fourteen and he was sixteen years old. In addition to Ruffini's testimony, six other women testified in the punishment phase that appellant had raped or forced unwanted sexual contact on them. There are similarities between the details of these attacks and Tina's kidnapping and rape. Two of the women were teenagers at the time of the attacks and schoolmates or friends of appellant. For one, appellant offered to give her a ride and then tried to force sex on her at their destination. He also forced his fingers inside her vagina. In trying to force sex on the other teen, appellant ripped her shirt, struck her in the face, and chased her while declaring, "You know you want it." Two of the women who testified at punishment were strippers whom appellant had hired and then raped in the midst of their striptease. One of the strippers was raped vaginally and anally, and she reported seeing a knife in appellant's bedside table. The final two

women who testified were strangers to appellant, but lived near Calder Road, a street significant in Tina's case. Of these two women, one was grabbed by appellant from behind, cut on the arm, and chased in circles around her truck before appellant gave up and fled. The other woman testified that appellant and another man abducted her in her car, drove to an isolated trailer, and anally and vaginally raped her over several hours. During part of the episode, appellant carried a knife and threatened to kill her.

Considering the above testimony and graphic evidence depicting Tina's kidnapping, aggravated sexual assault, and death, we hold that the result of the proceeding would not have been different had the State timely disclosed Ruffini's abuse of a gas-station credit card and her deferred adjudication probation for the offense.

Accordingly, we overrule appellant's seventh, eighth, ninth, and tenth issues.

### V. Bias of State Witnesses

■■■■■ In his third, fourth, fifth, and sixth issues, appellant claims he was denied his right to confront two of the State's witnesses, Justin Chapman and Wendy Ruffini. The Sixth Amendment to the U.S. Constitution guarantees the accused's right to be confronted with adverse witnesses. *Lopez v. State*, 18 S.W.3d 220, 222 (Tex.Crim.App.2000). "Each Confrontation Clause issue must be weighed on a case-by-case basis, carefully taking into account the defendant's right to cross-examine and the risk factors associated with the admission of the evidence." *Id.* The trial court may limit cross-examination when a subject is exhausted, when it is designed to annoy, harass, or humiliate, or when it might endanger the witness's personal safety. *Carroll v. State*, 916 S.W.2d 494, 498 (Tex.Crim.App.1996). The right to confrontation is violated, however, when

appropriate cross-examination is limited. *Id.* at 497. It is well settled that "[w]ithout question, a witness'[s] bias is a relevant issue at trial, and the Confrontation Clause gives a criminal defendant the right to explore potential biases of an accusing witness through cross-examination." *Hoyos v. State*, 982 S.W.2d 419, 420–21 (Tex. Crim.App.1998); *see also Carpenter v. State*, 979 S.W.2d 633, 634 (Tex.Crim.App. 1998) (stating that "[e]xposing a witness'[s] motivation to testify for or against the accused or the State is a proper and important purpose of cross-examination"). Thus, "[t]his broad scope necessarily includes cross-examination concerning criminal charges pending against a witness and over which those in need of the witness'[s] testimony might be empowered to exercise control." *Carroll*, 916 S.W.2d at 498.

### A. Justin Chapman

■■■■■ Appellant contends his right to confront Chapman was denied when he was not permitted to cross-examine him about his misdemeanor probation for driving while intoxicated. Appellant asserts Chapman's probation status made him vulnerable because he had violated several conditions of his probation. Appellant maintains that, absent Chapman's testimony during the guilt-innocence stage of the trial, there was no evidence to support a theory of kidnapping and "very scant circumstantial evidence that sexual relations were nonconsensual." Appellant argues the jury might have given less weight to Chapman's testimony if it had known that Chapman was on probation and had violated the conditions of his probation and, therefore, had motive to testify for the State.

Appellant concludes Chapman "was so afraid of having his probation revoked that he became a fugitive after he testified but before the conclusion of the trial." The

prosecutor contends neither he nor the investigator were aware of Chapman's probation before his testimony. The record shows that the prosecutor tried to contact Chapman but did not know his location. The prosecutor stated, "Justin Chapman's whereabouts are unknown. I was looking for Justin Chapman myself this morning. His whereabouts are currently unknown."

■ We find no error by the trial court and reiterate that Chapman's probationary status was not material, i.e., created a probability sufficient to undermine confidence in the jury's verdict. *See Thomas,* 841 S.W.2d at 404. In addition, Chapman was excused immediately after testifying on October 5, 1999, appellant did not reserve the right to recall Chapman for further cross-examination, and Chapman thus had no obligation to remain at the courthouse or to remain in contact with the prosecutor until the conclusion of trial. *See, e.g., French v. Brodsky,* 521 S.W.2d 670, 678 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.), *overruled on other grounds by Texarkana Memorial Hosp., Inc. v. Jones,* 551 S.W.2d 33 (Tex. 1977) (indicating an individual was not excused as a witness but instructed to remain in attendance). We overrule appellant's third and fourth issues.

## B. Wendy Ruffini

■ During the punishment phase, Ruffini testified that appellant raped her ten years earlier, when she was fourteen years of age. She admitted that the assault was never reported to police. At the time of trial, Ruffini was on deferred adjudication probation for credit card abuse, a third degree felony. Appellant sought to cross-examine Ruffini about her probation to show her motive in testifying for the State. Further, appellant's counsel informed the trial court that Ruffini had failed to adhere to her probationary terms

and that there was an outstanding warrant for her arrest. The prosecutor advised the trial court that no one on the prosecutorial team knew about the outstanding arrest warrant until just a few minutes earlier.

During appellant's bill of exceptions, Ruffini stated she asked an attorney to look into the credit card case because she had not heard anything about it for years. Ruffini stated she was unconcerned about her case, uninterested in currying favor with the State, and unconcerned with the State treating her more favorably than if she had testified against the State. The prosecutor stated that Ruffini was in custody and she would not be allowed to leave the courtroom until the issue regarding the arrest warrant had been resolved. Ruffini was actually taken into custody at that time and was still in custody two days later.

In the presence of the jury, appellant was allowed to ask Ruffini whether she wished "to curry favor" by testifying for the State. Ruffini denied appellant's assertion. After appellant made his bill of exceptions, the trial court concluded he had failed to show that Ruffini testified as a result of bias or motive and did not allow him to further pursue the subject.

Appellant complains he suffered harm because Ruffini's testimony "served to cement the State's theory of a ten-year-long pattern of allegations of sexual assaults by Mr. Drew justifying a life sentence." Appellant argues that because Ruffini's testimony was neither contradicted nor cumulative, her credibility was important. Appellant states that Ruffini's fear of going to the penitentiary, having violated her probation and having been placed in custody during recess, biased her and provided a motive to curry favor with the State.

A defendant is permitted to cross-examine the State's witness on the status of her deferred adjudication probation to show a potential motive, bias, or interest to testify for the State. *Maxwell v. State,* 48 S.W.3d 196, 200 (Tex.Crim.App.2001). We find the trial court erred in not permitting appellant to cross-examine Ruffini about a potential motive, bias, or interest in testifying for the State in this case.[2]

To determine whether the error requires reversal, we begin with the assumption "the damaging potential of the cross-examination were fully realized." *Shelby v. State,* 819 S.W.2d 544, 547 (Tex. Crim.App.1991). We next consider the following factors: (1) the importance of the witness's testimony in the State's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the State's case. *See id.* In addition to Ruffini's testimony, four other women testified at punishment that they had been sexually assaulted by appellant. Three additional women testified that they had been physically attacked by him. Having considered this testimony and the remaining factors, we find the trial court's error harmless. *See* TEX.R.APP. P. 44.2(a). Accordingly, we overrule appellant's fifth and sixth issues.

## VI. AUTOPSY PHOTOGRAPHS

In his eleventh issue, appellant claims the trial court erred in admitting ten "gruesome, detailed, color, close-up" post-autopsy photographs because the prejudicial effect significantly outweighed any probative value. The rules of evidence govern admissibility of inflammatory photographs. *Hicks v. State,* 860 S.W.2d 419, 426 (Tex.Crim.App.1993), *overruled on other grounds by Rosales v. State,* 4 S.W.3d 228 (Tex.Crim.App.1999), *cert. denied,* 531 U.S. 1016, 121 S.Ct. 576, 148 L.Ed.2d 493 (2000). Rule 403 requires an admissible photograph to have " 'some probative value and that its probative value not be substantially outweighed by its inflammatory nature.' " *Rojas v. State,* 986 S.W.2d 241, 249 (Tex.Crim.App.1998) (quoting *Long v. State,* 823 S.W.2d 259, 272 (Tex.Crim.App.1991)). In determining whether the inflammatory nature outweighs its probative value, the trial court should consider "the inherent tendency that some evidence may have to encourage [the] resolution of material issues on an inappropriate basis and should balance carefully against it the host of factors affecting probativeness, including relative weight of the evidence and the degree to which its proponent might be disadvantaged without it." *Fuller v. State,* 829 S.W.2d 191, 206 (Tex.Crim.App.1992), *overruled on other grounds by Castillo v. State,* 913 S.W.2d 529 (Tex.Crim.App. 1995). Relevant factors in ascertaining the admissibility of photographs under Rule 403 include the number of exhibits offered, their gruesomeness, detail, size, whether they are black and white or color, whether they are close-up, whether the

---

**2.** We note that at the time of trial, "denying a defendant the right to impeach a witness on the basis of the witness' [sic] deferred adjudication probation [did] not deny the defendant his constitutional right of confrontation." *Jones v. State,* 843 S.W.2d 487, 496 (Tex. Crim.App.1992); *Hoyos v. State,* 951 S.W.2d 503, 507 (Tex.App.—Houston [14th Dist.] 1997), *aff'd,* 982 S.W.2d 419 (Tex.Crim.App. 1998). However, the Court of Criminal Appeals, in *Maxwell,* has since held "that a defendant is permitted to cross-examine a State's witness on the status of his deferred adjudication probation in order to show a potential motive, bias or interest to testify for the State" and has specifically disavowed any language in *Jones* holding otherwise. *Maxwell,* 48 S.W.3d at 200.

body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Santellan v. State*, 939 S.W.2d 155, 172 (Tex.Crim.App.1997). It is within the trial court's discretion to admit photographs and its decision is disturbed on appeal only if it falls outside the zone of reasonable disagreement. *Jones v. State*, 944 S.W.2d 642, 651 (Tex.Crim.App.1996).

 Autopsy or post-autopsy photographs can be used to illustrate injuries and to reveal cause of death. *Ladner v. State*, 868 S.W.2d 417, 426 (Tex.App.—Tyler 1993, pet. ref'd). As long as the post-autopsy photograph aids the jury in understanding the injury and does not emphasize mutilation caused by the autopsy, the photograph is admissible even though it depicts the autopsy. *Todd v. State*, 911 S.W.2d 807, 819 (Tex.App.—El Paso 1995, no pet.); *see also Rojas*, 986 S.W.2d at 249 (stating autopsy photographs are generally admissible unless they depict mutilation of victim caused by autopsy itself). Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *Etheridge v. State*, 903 S.W.2d 1, 21 (Tex.Crim.App.1994); *Green v. State*, 840 S.W.2d 394, 410 (Tex.Crim.App.1992), *overruled on other grounds by Trevino v. State*, 991 S.W.2d 849 (Tex.Crim.App. 1999). Moreover, photographs are generally admissible where verbal testimony about the same matter is admissible. *Jones*, 944 S.W.2d at 652; *Emery v. State*, 881 S.W.2d 702, 710 (Tex.Crim.App.1994).

 Appellant specifically complains of post-autopsy photographs depicting (1) Tina's head with the top part of the skull sawed off, exposing the brain; (2) the skull with the scalp pulled over her face; (3) the interior part of the skull with the brain removed; (4) the brain outside the skull; and (5) the excised windpipe.[3] The record shows the photographs are close-up, in color, and 3½ by 5 inches in size. Appellant contends other means of proof were available, such as testimony of the medical examiner, the autopsy report, and diagrams. With regard to circumstances unique to this case, appellant states there was no eyewitness to testify about how Tina sustained her injuries, therefore, "the medical examiner's testimony was crucial in conjuring up in the juror's minds what could have happened to result in the findings he made."

At trial, when appellant objected to the introduction of the photographs on the ground that the prejudicial effect significantly outweighed any probative value, the State responded that the photographs would aid the medical examiner in describing to the jury the injuries and the cause of death. However, during appellant's voir dire, the medical examiner testified that it was unnecessary to use autopsy photographs to explain Tina's injuries to the jury. The record reveals the medical examiner nonetheless used the photographs in describing Tina's injuries. For example, viewing the large area of bruising on the opposite side of Tina's brain from the location of the external injury, the medical examiner explained in detail that the inter-

---

3. Appellant also states that in addition to the ten post-autopsy photographs, there were four unnecessary photographs related to medical procedures performed at the hospital, which show (1) bruises on Tina's face; due to hemorrhaging, with tubes coming from her nose; (2) a side view of Tina's shaven head with several incision wounds and large stitches; (3) Tina's entire naked body, with the incision wounds and stitches in her head; and (4) a tube coming from her genitalia. Appellant, however, has not specifically complained of those four photographs on appeal and, therefore, we need not consider the trial court's decision to admit them.

nal examination of Tina's head revealed that the injury was caused by her moving head hitting a stationary object. Similar post-autopsy photographs have been held to be admissible to aid the jury in understanding the victim's injuries and cause of death.[4]

Appellant's expert witness, a forensic pathologist, did not personally view the body, but reached her conclusions after reviewing the post-autopsy photographs, in addition to reviewing the medical records and the autopsy report. Appellant's expert testified that Tina received her head injuries from an accidental fall.

With regard to the photograph of Tina's windpipe, the record shows the medical examiner and appellant's expert also disagreed about the injuries. The medical examiner testified that the bruising indicated direct compression of the neck, which is often present in cases involving manual strangulations, while the defense expert testified the soft tissue hemorrhage around Tina's neck was caused by the insertion of a breathing tube.

We find the trial court did not err in admitting the post-autopsy photographs. We conclude the photographs were admissible to rebut the defensive theory that Tina's death was an accident. *See Phipps,* 904 S.W.2d at 958 (concluding that photographs aided determination of whether victim's death was result of intentional act or accident); *Ladner,* 868 S.W.2d at 427 (finding photographs, along with pathologist's testimony, discredited defense theory of cause of death). Further, we conclude the photographs were admissible in light of the competing theories offered by the State and appellant.

 In any event, even if the trial court erred in admitting any of the post-autopsy photographs, a conviction will not be reversed "merely because the jury was exposed to numerous admittedly 'gruesome' pictures." *Long,* 823 S.W.2d at 275. The erroneous admission of evidence is nonconstitutional error and is subject to harm analysis under Texas Rule of Appellant Procedure 44.2(b), which provides "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX.R.APP. P. 44.2(b). In other words, after examining the record as a whole, the appellate court must disregard this error if it has fair assurance that the error did not influence the jury or had but a slight effect. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998). We find the admission of the post-autopsy photograph did not affect appellant's substantial rights. Accordingly, we overrule appellant's eleventh issue.

## VII. JURY INSTRUCTION: CULPABLE MENTAL STATE

 In his twelfth issue, appellant contends the trial court erred in refusing to include a culpable mental state in the jury instruction on felony murder. To reverse on the basis of charge error, Article 36.19 of the Texas Code of Criminal Procedure provides, in relevant part:

> Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15,

---

4. *See, e.g., Harris v. State,* 661 S.W.2d 106, 107 (Tex.Crim.App.1983) (color photograph showing child's skull after skin had been deflected back); *Todd,* 911 S.W.2d at 820 (photo of brain in skull); *Phipps v. State,* 904 S.W.2d 955, 958 (Tex.App.—Beaumont 1995, no pet.) (8″ × 12″ color photograph depicting head with top layer of skin peeled back); *Ladner,* 868 S.W.2d at 426–27 (enlarged photograph showing victim's scalp pulled back from the head); *Sandow v. State,* 787 S.W.2d 588, 597 (Tex.App.—Austin 1990, pet. ref'd) (photograph showing victim's brain with pool of blood in depressed area near forehead).

36.16, 36.17, and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial.

TEX.CODE.CRIM. PROC. ANN. art. 36.19 (Vernon 1981). If the defendant timely objects to error in the charge, reversal is required if the error is " 'calculated to injure the rights of defendant,' which means no more than that there must be some harm to the accused from the error." *Ovalle v. State,* 13 S.W.3d 774, 786 (Tex.Crim.App.2000) (quoting *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984)). In other words, properly preserved error will require reversal so long as the error is not harmless. *Id.* Thus, in reviewing charge error, " 'the actual degree of harm must be assayed in light of *the entire jury charge,* the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.' " *Id.* (quoting *Almanza,* 686 S.W.2d at 171) (emphasis added).

■ Section 19.02(b)(3) of the Texas Penal Code provides that a person commits felony murder if he

commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PEN.CODE ANN. § 19.02(b)(3) (Vernon 1994). The felony murder rule dispenses with the necessity of proving the *mens rea* accompanying the homicide because the underlying felony supplies the culpable mental state. *Johnson v. State,* 4 S.W.3d

254, 255 (Tex.Crim.App.1999); *Murphy v. State,* 665 S.W.2d 116, 120 (Tex.Crim.App. 1983).

■ The jury charge in this case defined felony murder:

A person commits the offense of felony murder if he commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of the individual.

Therefore, if you find from the evidence beyond a reasonable doubt that on or about the 30th day of November, 1998, in Harris County, Texas, the defendant, Jonathan David Drew, on or about the 30th day of November, 1998, did then and there unlawfully, while in the furtherance of the commission of the felony of kidnapping of Tina Flood or in immediate flight from the commission of the felony of kidnapping of Tina Flood, the defendant committed an act clearly dangerous to human life that caused the death of Tina Flood, to-wit: by striking Tina Flood with an unknown object; or

If you find from the evidence beyond a reasonable doubt that on or about the 30th day of November, 1998, in Harris County, Texas, the defendant, Jonathan David Drew, on or about the 30th day of November, 1998, did then and there unlawfully, while in the furtherance of the commission of the felony of aggravated sexual assault of Tina Flood or in immediate flight from the commission of the felony of aggravated sexual assault of Tina Flood, the defendant committed an act clearly dangerous to human life that caused the death of Tina Flood, to wit: by striking Tina Flood with an unknown object; or

If you find from the evidence beyond a reasonable doubt that on or about the 30th day of November, 1998, in Harris County, Texas, the defendant, Jonathan David Drew, on or about the 30th day of November, 1998, did then and there unlawfully, while in the furtherance of the commission of the felony of kidnapping of Tina Flood or in immediate flight from the commission of the felony of kidnapping of Tina Flood, the defendant committed an act clearly dangerous to human life that caused the death of Tina Flood, to-wit: by causing Tina Flood to strike an unknown object; or

If you find from the evidence beyond a reasonable doubt that on or about the 30th day of November, 1998, in Harris County, Texas, the defendant, Jonathan David Drew, on or about the 30th day of November, 1998, did then and there unlawfully, while in the furtherance of the commission of the felony of aggravated sexual assault of Tina Flood or in immediate flight from the commission of the felony of aggravated sexual assault of Tina Flood, the defendant committed an act clearly dangerous to human life that caused the death of Tina Flood, to-wit: by causing Tina Flood to strike an unknown object, then you will find the defendant guilty of felony murder.

Although felony murder requires that a culpable mental state be proved for the predicate offense, which is then transferred to the killing, appellant complains the jury was not instructed to find a culpable mental state for the underlying allegations of aggravated sexual assault or kidnapping. Appellant claims if the jury believed, as it must have, that Tina's death was accidental, it could not lawfully transfer the intent or knowledge, unless the trial court's instruction included the required culpable mental state for the underlying offense of aggravated sexual assault or kidnapping. A review of the charge establishes that although definitions of aggravated sexual assault and kidnapping and their culpable mental states were not included in the instruction for felony murder, the underlying felonies were defined with their culpable mental states under capital murder and as lesser included offenses.

 The charge tracks the language of the felony murder statute. A charge that tracks the language of the applicable statute is generally proper on the statutory issue. *Martinez v. State*, 924 S.W.2d 693, 699 (Tex.Crim.App.1996); *Riddle v. State*, 888 S.W.2d 1, 8 (Tex.Crim.App.1994). The State argues the trial court instructed the jury to find appellant guilty of felony murder if it found that he had committed an act clearly dangerous to Tina's life that caused her death, while in the course of committing either kidnapping or aggravated sexual assault. Therefore, the jury was necessarily required to find appellant guilty of either kidnapping or aggravated sexual assault to convict appellant of felony murder. We agree. The trial court defined those underlying felonies twice in the charge. Considering the charge as a whole, we find the charge sufficiently instructed the jury on the culpable mental states for kidnapping and aggravated sexual assault. *See Dinkins v. State*, 894 S.W.2d 330, 339 (Tex.Crim.App.1995) ("When we review a charge for alleged error, we must examine the charge as a whole instead of a series of isolated and unrelated statements."). Appellant's twelfth issue is overruled.

## VIII. JURY INSTRUCTION: UNANIMOUS FINDING

 In his thirteenth issue, appellant claims the trial court erred in failing to charge the jury that all its members must unanimously agree that one of the underly-

ing offenses, either kidnapping or aggravated sexual assault, was proved beyond a reasonable doubt. Appellant argues, therefore, some jurors could have found him guilty of aggravated sexual assault, while other jurors could have found him guilty of kidnapping.

The Texas Court of Criminal appeals has addressed this issue. *See Kitchens v. State*, 823 S.W.2d 256 (Tex.Crim.App.1991). In *Kitchens*, the defendant, who had been convicted of capital murder, argued the trial court had erred in submitting to the jury alternative theories of capital murder in one application paragraph. *Id.* at 257. The defendant complained the verdict would not be unanimous because some jurors could have found him guilty of murder in the course of aggravated sexual assault while other jurors could have found him guilty of murder in the course of robbery. *Id.* The court rejected the defendant's argument and noted that alternate pleading of the differing methods of committing one offense may be charged in one indictment. *Id.* at 258. Moreover, although the indictment may include allegations of different methods of committing the offense in the conjunctive, the jury may be properly charged in the disjunctive. *Id.* Therefore, when the alternate theories of committing the same offense are submitted to the jury in the disjunctive, it is appropriate for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted. *Id.* In other words, " 'there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' " *Id.* (quoting *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990))).

The State argues the reasoning in *Kitchens* also applies to felony murder, i.e., that the jury was not required to agree on appellant's guilt in the underlying offense. The distinguishing element between capital murder and felony murder is the culpable mental state of the offender. *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex.Crim.App.1993). Capital murder requires the existence of an intentional cause of death, while felony murder requires an intent to commit only the underlying offense. *Creel v. State*, 754 S.W.2d 205, 211 (Tex.Crim.App.1988). The State argues there is no difference in the purpose of the underlying felonies for capital murder and felony murder. Therefore, the jury was not required to agree upon kidnapping or aggravated sexual assault in convicting appellant for felony murder.

Appellant contends the logic underlying *Kitchens* does not apply to felony murder. For an intentional murder to be a capital offense, it merely has to be committed in the course of committing another designated felony; which felony does not matter. *See* Tex. Pen.Code Ann. § 19.03(a)(2) (Vernon 1994). The *culpable mental state for capital murder is supplied by the intentional murder. See Rousseau*, 855 S.W.2d at 673 ("[T]he only difference between the two offenses is the culpable mental state of the offender.... Capital murder requires the existence of an 'intentional cause of death,' ... while in felony murder, 'the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying ... felony....' ") (quoting *Rodriquez v. State*, 548 S.W.2d 26, 29 (Tex.Crim.App.1977)). To be guilty of felony murder, appellant argues, on the other hand, the jury must find a defendant had the required culpable mental state to commit a specific underlying felony because the underlying offense supplies the requisite mental state.

Citing this court to *Francis v. State,* appellant further asserts that without the unanimity requirement, the jury risks convicting the defendant on different acts. *Francis v. State,* 36 S.W.3d 121, 125 (Tex. Crim.App.2000) (opinion on reh'g) (citing *United States v. Holley,* 942 F.2d 916, 925 (5th Cir.1991)). In *Francis,* the defendant was charged with one count of indecency with a child in a single paragraph indictment. *Id.* at 122. The State presented evidence of four distinct acts of indecency with a child, two acts of touching the victim's breasts and two acts of touching the victim's genitals, with each act occurring at a different time and date. *Id.* The State elected to pursue a conviction based on two of the incidents, one involving touching the victim's breasts and one involving touching the victim's genitals. *Id.* The court concluded *Kitchens* was not applicable to that case. *Id.* at 123. Unlike *Kitchens,* where alternate theories of committing the same offense were submitted to the jury, the *Francis* court found *two separate offenses* were submitted to the jury in the disjunctive. *Id.* at 124.[5] "By doing so, it is possible that six members of the jury convicted appellant on the breast-touching offense (while the other six believed he was innocent of the breast-touching) and six members convicted appellant on the genital-touching offense (while the other six believed he was innocent of the genital-touching)." *Id.* at 125.

 We find *Francis* is distinguishable and, instead, conclude *Kitchens* is the controlling authority in this case. As in *Kitchens,* we find alternate methods of committing felony murder, not separate offenses, were submitted to the jury. When there is more than one way to commit an offense, there is no general require-ment that the jury agree on the means of committing that offense:

> As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict. When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her.

*Schad,* 501 U.S. at 649–50, 111 S.Ct. 2491 (Scalia, J., concurring) (citations omitted). The evidence is sufficient to support aggravated sexual assault or kidnapping; therefore, the evidence is sufficient to support a conviction for felony murder. We overrule appellant's thirteenth issue.

## IX. HEARSAY

 In his fourteenth and fifteenth issues, appellant contends the trial court erred in admitting Tina's hearsay statements because such statements were not admissible as excited utterances. A hearsay statement is admissible as an excited utterance when it relates "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX.R. EVID. 803(2); *Wood v. State,* 18 S.W.3d 642, 652 (Tex.Crim.App.2000). In determining whether a statement is an excited utterance, the "pivotal inquiry is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the

---

**5.** The charge in *Francis* inquired whether the defendant had "engaged in sexual contact by touching the breast *or* genitals." *Francis,* 36 S.W.3d at 124. (emphasis in original).

event.'" *King v. State,* 953 S.W.2d 266, 269 (Tex.Crim.App.1997) (quoting *McFarland v. State,* 845 S.W.2d 824, 846 (Tex. Crim.App.1992), *overruled on other grounds by Bingham v. State,* 915 S.W.2d 9 (Tex.Crim.App.1994)). The time elapsed between the occurrence of the event and the utterance is only one factor to consider in determining the admissibility of the hearsay statement. *Lawton v. State,* 913 S.W.2d 542, 553 (Tex.Crim.App.1995). Therefore, if the statements were made while the declarant was in the grip of the emotion, excitement, fear, or pain of the event, and those statements relate to the exciting event, they are admissible even if appreciable time has elapsed between the exciting event and the making of the statement. *Jones v. State,* 772 S.W.2d 551, 555 (Tex.App.—Dallas 1989, pet ref'd) (citing *Penry v. State,* 691 S.W.2d 636, 647 (Tex. Crim.App.1985)). The fact that the declaration was in response to questions is likewise only one factor for consideration and does not alone render the statement inadmissible. *Lawton,* 913 S.W.2d at 553.

▇▇▇ Tina stated at various times in the emergency room, "Please help me," "Don't hurt me," and "Please don't rape me." [6] Tina made these statements one to three hours after Deputy Kitchens first pulled appellant over. Appellant argues because there had been a passage of time and because Tina had undergone painful and unpleasant medical procedures, including a "rape kit" examination, her statements were not excited utterances, but could have been in response to the painful medical treatments. Therefore, according to appellant, there was no proof about what the alleged startling event was for the excited utterance exception.

In the hospital emergency room, Tina appeared to be in pain. She was moaning, unresponsive to questions, and unable to assist hospital personnel with her treatment. Despite appellant's assertions that there had been a significant elapse of time and that her statements were made in response to painful medical treatments, we find Tina's behavior in the emergency room is consistent with the severity of injuries she had sustained and demonstrates that she was still dominated by the emotion, excitement, fear, or pain of the events at the time she made the statements. *See Jones,* 772 S.W.2d at 555 (stating that even in passage of time, statements are admissible if declarant was in grip of emotion, excitement, fear, or pain of event).

Appellant cites the proposition in *Kipp v. State* that "[w]hile one who is subjected to a sexual assault will undoubtedly experience a great deal of stress and emotional pain as a result thereof, we cannot say that one's statements thereafter in connection with such experience amount to 'excited utterances' under Rule 803(2)." *Kipp v. State,* 876 S.W.2d 330, 338 n. 13 (Tex.Crim. App.1994). *Kipp* is distinguishable. It involved a conviction for indecency with a six-year-old child who spoke about what "her daddy" had done to her while reenacting the events with a doll. *Id.* at 336. The State called the neighbor to testify at trial. *Id.* The court concluded the neighbor's testimony did not reflect the emotional state of the child or indicate that the child was still dominated by the emotions, excitement, fear, or pain of the event at the time she made the statement. *Id.* at 338 n. 13. We do not find *Kipp* controlling in this case. Instead, we find Tina was in the grip of the emotion, excitement, fear,

---

**6.** Officer Hatton observed Chapman banging on the doors of the bar at 2:52 a.m. Deputy Kitchens first encountered appellant and Tina at 3:49 a.m. Therefore, Tina's injuries occurred during that hour. Tina arrived at the hospital at 4:40 a.m.

and pain of the events that took place between the time appellant left the parking lot of the bar with Tina and when Deputy Kitchen pulled appellant over. We conclude the trial court did not err in admitting Tina's statements as excited utterances.

■ Appellant argues the trial court's error is constitutional, requiring this court to find beyond a reasonable doubt that the error did not contribute to the conviction. TEX.R.APP. P. 44.2(a). Appellant's assertion is incorrect. The admission of inadmissible hearsay constitutes nonconstitutional error and is considered harmless if the appellate court, after examining the record as a whole, is reasonably assured that the error did not influence the jury verdict or had but a slight effect. TEX.R.APP. P. 44.2(b); *Thomas v. State*, 1 S.W.3d 138, 142 (Tex.App.—Texarkana 1999, pet. filed) (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998)). A review of the record establishes that, without Tina's statements, the evidence is otherwise sufficient to prove appellant kidnapped, sexually assaulted, and inflicted the injury that caused her death. Therefore, we find that even if the trial court erred in admitting Tina's statements, any such error was harmless because it did not influence the jury verdict or had but a slight effect. Appellant's fourteenth and fifteenth issues are overruled.[7]

## X. VOIR DIRE

In his sixteenth and seventeenth issues, appellant asserts the trial court erred in denying his motion to reopen voir dire after an eight-week break between jury selection and opening statements. Appellant argues he was denied his federal and state constitutional rights to effective assistance of counsel because his trial attorneys were unable to intelligently make challenges for cause and exercise his remaining peremptory challenge.

■ The trial court may impose reasonable restrictions on the exercise of voir dire examination. *Ford v. State*, 14 S.W.3d 382, 390 (Tex.App.—Houston [14th Dist.] 2000, no pet.). We review the trial court's decision to limit voir dire under an abuse of discretion standard. *Id.* The trial court abuses its discretion when it limits a proper question concerning a proper area of inquiry. *Dinkins v. State*, 894 S.W.2d 330, 345 (Tex.Crim.App.1995). "[T]he permissible areas of questioning the venire in order to exercise peremptory challenges are broad and cannot be unnecessarily limited." *Linnell v. State*, 935 S.W.2d 426, 428 (Tex.Crim.App.1996). The trial court may limit voir dire when a question commits a veniremember to a specific set of facts, the questions are duplicitous or repetitious, the venire member had already stated his position clearly and unequivocally, and the questions are not in the proper form. *Ford*, 14 S.W.3d at 390 (citing *Dinkins*, 894 S.W.2d at 345).

Jury selection occurred from July 19, 1999, to August 11, 1999. The court then recessed and trial began on October 4, 1999. Appellant had used all but one of his peremptory strikes. During the interim, this case received additional publicity because appellant was considered to be a suspect in the disappearance of Jessica Cain, a young woman from the same area. When the trial commenced, appellant moved for voir dire to be reopened because he wanted to inquire about prejudi-

---

**7.** At trial, the State argued Tina's statements were admissible under the medical treatment and excited utterance exceptions. Because we find that Tina's statements were admissible as excited utterances, we need not address whether her statements were admissible under the medical treatment exception.

cial media coverage and changes in the personal life experiences of jurors during the intervening weeks. The trial court denied appellant's motion and only asked if any of the jurors had served on a jury in the interim.

Appellant claims that at least one juror, Number 10, Sandra Chumbley, "apparently had been following the [Jessica] Cain investigation as she indicated during voir dire on August 4, 1999." The following exchange between juror Chumbley and appellant's trial counsel occurred during voir dire:

A. And this happened in Clear Lake?

Q. Yeah.

A. Only thing I know about was the 45 South, going toward that way, where the missing girl—the one that was on the freeway, her car supposedly had stopped down or she was in a truck or something and it broke on her or something and she was missing, and another girl in Friendswood. Those are basically the only things I remember about that way—you know, going towards that way. . . .

\* \* \*

Q. Yeah. And it has to do with a girl and a truck and a guy getting stopped and [a] girl in a truck?

A. On 45, the freeway?

Q. Well, no, I don't think it was on the freeway; but, it's down in Clear Lake.

A. No.

\* \* \*

Q. You're relatively sure you don't remember seeing—it was also on TV a bunch and radio when it first happened.

A. I can't recall that one.

Appellant contends the publicity linking him to Jessica Cain's disappearance could have affected that juror's ability to fairly and impartially consider the evidence in this case, thereby providing a ground for a challenge for cause or to exercise his final peremptory challenge. Although the trial court admonished jurors not to read the newspapers or watch any news coverage about this case, appellant complains the trial court did not instruct the jurors to avoid publicity about the Jessica Cain case.

Appellant filed a motion for new trial in which he asserted "[t]he Court erred in refusing to inquire whether any juror had been exposed to matters during the interlude between July 19th, 1999 (beginning of jury selection) and October 4th, 1999 (beginning of trial) that caused them to form a conclusion as to any element of the alleged offense."

▮▮▮ Although Texas Rule of Evidence 606(b) does not permit a juror to testify as to matters occurring, or statements made, during deliberations, it does allow a juror to testify about outside influences that affected the juror's decision. Tex.R. Evid. 606(b).[8] Media coverage about appellant constitutes an outside influence, and Rule 606(b) thus permits a juror to testify about such. An allegation of juror misconduct in a motion for new trial must be supported by a juror's affida-

---

8. Rule 606(b) states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or the effect of anything on the juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or

any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.
> Tex.R. Evid. 606(b).

vit showing that "outside influences" affected the jury's decision. *Hines v. State,* 3 S.W.3d 618, 623 (Tex.App.—Texarkana 1999, pet. ref'd). Appellant, however, did not attach an affidavit from any juror about the media's influence on his or her decision to convict appellant, nor did he request a hearing on this issue. Appellant, therefore, has not shown any outside influence that affected any juror's decision in this case. We find the trial court did not abuse its discretion in refusing to reopen voir dire.[9] Appellant's sixteenth and seventeenth issues are overruled.

## XI. IMPROPER JURY ARGUMENT

In his eighteenth and nineteenth issues, appellant claims the trial court erred in overruling his objections to the prosecutor's argument at punishment, which injected new and harmful facts into the case, and in which the prosecutor opined on appellant's guilt for an extraneous offense. The four permissible areas of jury argument are (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to the argument of opposing counsel; and (4) plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex.Crim.App.1999), *cert. denied,* 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000); *Wilson,* 7 S.W.3d at 147. Not every inappropriate remark made during closing argument mandates the reversal of a conviction. *Lagrone,* 942 S.W.2d at 619. We disregard improper jury argument unless it affects the appellant's substantial rights. TEX.R.APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.

Crim.App.1997) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). We analyze the statements at issue in the context of the entire jury argument, rather than in isolated sentences. *Castillo v. State,* 939 S.W.2d 754, 761 (Tex.App.—Houston [14th Dist.] 1997, pet. ref'd); *Williams v. State,* 826 S.W.2d 783, 785–86 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd).

During punishment, T.C. testified that she had been sexually assaulted by appellant and another individual. She further testified that appellant ejaculated on her stomach. A rape examination performed on her recovered a male fraction inconsistent with appellant's DNA. A stipulation to that effect was read to the jury:

> The State of Texas stipulates that a DNA analysis of items recovered from the "rape kit" testified to by [T.C.] revealed DNA inconsistent with [T.C.] and Jonathan Drew. Only one "male fraction DNA component" was identified.

In his closing statement, the prosecutor then argued:

> I wanted to be clear about the DNA. I think you're clear about it, and I only have a few more minutes to speak to you. What the stipulation says is this: That there was DNA analyzed that was inconsistent with both [T.C.] and Jonathan Drew, but that there was a male fraction. And if you remember Dr. Mathew's testimony, he talks about separating out the male fractions by chemicals and that the male's is more difficult.... So the male fraction was not identified. *Jonathan Drew's fraction was on the outside of her body.*[10]

9. Because we have found no error in denying appellant's request to reopen voir dire, it is not necessary to determine the applicable harm analysis.

10. Emphasis added.

Appellant's trial counsel objected to the above-quoted argument, and the following took place:

MR. DEGEURIN [Appellant's counsel]: Your Honor, I object. If I was tricked by the wording he put in that stipulation, I want the intent of that stipulation stated to the jury—

* * *

MR. DEGEURIN: —which was he was excluded as a donor.

THE COURT: The stipulation is in evidence. Your objection is overruled. The jury has the stipulation to examine.

MR. DEGEURIN: The problem is—I didn't realize he was going to wait until the very last minute where I can't respond and then argue—

* * *

MR. DEGEURIN: You knew the intent of the stipulation, also. It was the same—

* * *

MR. OWMBY: There's no trick to it. Why did we put her on if we didn't think that Jonathan Drew did it?

MR. DEGEURIN: Objection, Your Honor. May I approach the bench?

THE COURT: Yes.

MR. OWMBY: Your Honor, I'm responding to the argument that he was tricked.

* * *

MR. DEGEURIN: I move for a mistrial, stating the personal opinion of the Prosecution, which is wrong.

MR. OWMBY: He has personally stated that I tricked him.

THE COURT: Your objection is overruled.

MR. DEGEURIN: I did not say he did or did not believe. I said he has tricked me.

THE COURT: Your motion for mistrial is denied.

 Appellant's first argument on appeal is that the prosecutor's argument injected new and harmful facts that are outside the record. A complaint on appeal that does not comport with the objection lodged at trial is waived. *Santellan,* 939 S.W.2d at 171. A review of the record shows appellant waived error by not making this specific objection at trial. Appellant's trial counsel objected that he had been "tricked" by the wording of the stipulation. He did not object on the basis that the prosecutor was arguing new facts, outside the record.

 Appellant also complains of the prosecutor's statement: "There's no trick to it. Why did we put her on if we didn't think that Jonathan Drew did it?" Appellant argues the prosecutor stated his personal opinion of appellant's guilt in the sexual assault of T.C. and invited the jury to speculate on additional facts of which the prosecutor had knowledge, i.e., that a DNA fraction was found outside T.C.'s body that matched appellant's DNA, which indicated appellant's guilt of the sexual assault of T.C.

 The State contends the prosecutor's remark was in response to defense counsel's assertion that he had been "tricked" by the wording of the stipulation and was proper under the invited argument rule. Under the invited argument rule, the prosecutor is allowed to respond to a defensive argument that goes outside the record. *Wilson v. State,* 938 S.W.2d 57, 60 (Tex.Crim.App.1996); *Tucker v. State,* 15 S.W.3d 229, 237 (Tex.App.— Houston [14th Dist.] 2000, pet. ref'd). We agree with the State's contention. Appellant's trial counsel initially objected on the basis of his understanding of the stipulation. Argument about trial counsel's belief as to the intent of the stipulation, which

was admitted into evidence, is outside the evidentiary record. However, as long as the prosecutor's argument does not "stray beyond the scope of the invitation," such argument is proper. *Johnson v. State,* 611 S.W.2d 649, 650 (Tex.Crim.App.1981). We do not find that the prosecutor's argument went beyond the scope of appellant's objection. We overrule appellant's eighteenth and nineteenth issues.

Accordingly, we affirm the judgment of the trial court.