COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-279-CR
 
 
CHANTE 
JAWAN MALLARD                                                   APPELLANT
 
V.
 
THE 
STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM 
THE 371ST DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
 
I. Introduction
 
        Appellant 
Chante Jawan Mallard appeals her convictions for tampering with evidence and for 
murder. Mallard pleaded guilty to tampering with evidence but pleaded not guilty 
to murder.  The jury found her guilty of both offenses and assessed her 
punishment at ten years’ confinement for tampering with evidence and fifty 
years’ confinement for murder.  In five points, Mallard argues that the 
evidence is legally and factually insufficient to sustain her conviction for 
murder, that the trial court erred by defining transferred intent in the jury 
charge, that the trial court erred by charging the jury on concurrent causation, 
and that the trial court erred by overruling her motion for a mistrial based on 
the State’s alleged comment on her post-arrest silence.[1]  
We will affirm.
II. Factual 
Background
        On 
October 25, 2001, in preparation for an evening at Joe’s Big Bamboo Club, 
Mallard and her friend Titilisee Fry[2] had a drink 
and split an ecstacy pill before smoking a marijuana joint on the way to the 
club.  Mallard socialized, danced, smoked marijuana, and drank three or 
more drinks before leaving the club about 2:30 a.m.  Mallard attempted to 
drive, but Fry could tell that Mallard was intoxicated; so, Fry drove.  
After they arrived at Fry’s house, Mallard decided to go home. She got in her 
car and drove away.  Mallard’s statement, which was admitted into 
evidence, explained the events that followed.
  
I drove my 1997 Chevrolet Cavalier toward home and that’s how I was on Frwy. 
287.
 
I 
think when I was coming around the bend from Loop 820, before Village Creek, all 
of a sudden, bam, he was just there.  I realized that it was a person I had 
hit and he had come through the right front windshield.  I was scared and 
terrified and the car didn’t even slow down. . . . He was on my car and stuck 
through the right front windshield.  I parked my car in the garage and I 
put the door down. . . . I wanted to take him to the hospital, but I was so 
scared. . . .
 
 
        Fry 
testified that Mallard called her at approximately 3:30 a.m. and whispered, 
“T,[3] come pick me up.”  When Fry arrived at 
Mallard’s house, Mallard came running out, jumped into the car, and started 
screaming for Fry to drive.  Mallard used Fry’s cell phone to call some 
friends named Terrence and Vaughn.  Mallard and Fry tried to track down 
Terrence at his apartment and at his sister’s house, but they were 
unsuccessful and headed back to Mallard’s house.
        Mallard 
then told Fry that she had hit “a white guy,” that she was sorry, that she 
did not mean to do it, and that she had tried to get him off the car near the 
Martin/Village Creek area, but that he was too heavy.  Mallard admitted 
that the man was alive when she drove into her garage; she heard him moan.
        When 
Fry and Mallard returned to Mallard’s house, Fry went into the garage and saw 
the back side of a body sticking out of the car’s windshield.  Fry said 
that she told Mallard to call 911, but Mallard never did.  Later, they both 
left and went to Fry’s house to sleep.
        The 
next morning, Mallard borrowed Fry’s car and cell phone and attempted to 
locate Vaughn.[4] Clete—a/k/a Vaughn—testified 
that Mallard met him at his grandmother’s house and that they drove to 
Mallard’s house.  On the way, Mallard told him that “she messed up real 
bad.”  When they arrived, she allowed him into the garage, and he saw a 
man hanging through the front windshield into the passenger side floorboard of 
the car.  Clete touched the man with a rake to see if he was alive, but the 
man did not move.  He decided that they were not going to bury the body; 
instead, they were going to put it somewhere the victim’s family could find 
him and bury him.  Clete stated that he was not going to move the body by 
himself, so he called his cousin, Tyrone, to help. Clete and Mallard borrowed a 
friend’s car and drove it to Mallard’s house, where Clete shoveled the body 
into a blanket, tied up the blanket, put the blanket into the trunk of the car, 
and drove with Tyrone and Mallard to Cobb Park.  Tyrone and Clete removed 
the body from the trunk, laid it on the ground, and took off the blanket.  
After leaving the body in the park, Clete, Tyrone, and Mallard went to a car 
wash and threw away the blanket.
        On 
October 27, 2001, two older gentlemen stopped by a fire station where 
firefighter Todd Breedlove was getting off duty.  The two men reported that 
there was someone who looked dead in Cobb Park. Breedlove drove to Cobb Park, 
saw the dead white male, and called 911.  Brad Patterson with the Fort 
Worth Police Department arrived and completed a crime scene search.  He 
noted that the victim’s shoes and socks were missing, which indicated to 
Patterson that a vehicle may have run into the victim. He also noted that there 
was no blood at the scene; thus, Patterson concluded that the victim had been 
moved to the park and placed where he could be found.
        An 
autopsy revealed that the victim, Greg Biggs, suffered a near total amputation 
of his left leg and that he bled to death from this injury.  The medical 
examiner initially classified the autopsy results as “pending” but changed 
the status to “could not be determined” on January 7, 2002 when information 
concerning the victim’s death failed to surface.  After police obtained 
information from one of Fry’s friends and arrested Mallard in March 2002, 
however, the medical examiner ruled Mr. Biggs’s death a homicide based on the 
new information.
III. 
Sufficiency of the Evidence
        In 
her first and second points, Mallard argues that the evidence is legally and 
factually insufficient to sustain her conviction for felony murder.[5] See Tex. 
Penal Code Ann. § 19.02(b)(3) (Vernon 2003). The felony murder 
indictment alleges,
  
Chante Jawan Mallard hereinafter called Defendant, in the County of Tarrant and 
State aforesaid, on or about the 26th day of October 2001, did then and there 
intentionally or knowingly commit or attempt to commit a felony, to-wit: failure 
to stop and render aid as proscribed in Texas Transportation Code § 550.021 
which [is] captioned “accident involving personal injury or death,” and in 
the course of and in furtherance of the commission or attempt, or in immediate 
flight from the commission or attempt, she committed or attempted to commit an 
act clearly dangerous to human life, to-wit: transported Greg Biggs to her home 
when he was seriously injured and lodged in her car, or lodged in the windshield 
of her car, and she secreted him in her garage which prevented him from 
receiving medical care, which caused the death of Greg Biggs.
 
 
Mallard 
argues that the State failed to prove that she committed an act dangerous to 
human life; she claims that at most the State proved an omission and that an 
individual’s failure to act cannot constitute felony murder.  The State 
maintains that the evidence affirmatively demonstrates that Mallard did commit 
an act clearly dangerous to human life and that her act caused Mr. Biggs’s 
death; the act of driving Mr. Biggs, bleeding and injured, to her house and 
hiding him in her garage caused his death.  See Tex. Penal Code Ann. § 19.02(b)(3) 
(providing that a person commits the offense of murder if she commits a felony 
and in furtherance of the commission or in immediate flight from the commission 
of the offense, she commits an act clearly dangerous to human life that causes 
death).
        A. Legal Sufficiency Standard of Review
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v. State, 133 S.W.3d 
618, 620 (Tex. Crim. App. 2004).
        This 
standard gives full play to the responsibility of the trier of fact to resolve 
conflicts in the testimony, to weigh the evidence, and to draw reasonable 
inferences from basic facts to ultimate facts. Jackson, 443 U.S. at 319, 
99 S. Ct. at 2789. The trier of fact is the sole judge of the weight and 
credibility of the evidence. See Tex. 
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State, 
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal 
sufficiency review, we may not re-evaluate the weight and credibility of the 
evidence and substitute our judgment for that of the fact finder. Dewberry v. 
State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 
U.S. 1131 (2000). We must resolve any inconsistencies in the evidence in favor 
of the verdict. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 
2000).
        B. Factual Sufficiency Standard of Review
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence in a neutral light, favoring neither party. See 
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). The only 
question to be answered in a factual sufficiency review is whether, considering 
the evidence in a neutral light, the fact finder was rationally justified in 
finding guilt beyond a reasonable doubt. Id. at 484. There are two ways 
evidence may be factually insufficient: (1) the evidence supporting the verdict 
or judgment, considered by itself, is too weak to support the finding of guilt 
beyond a reasonable doubt; or (2) when there is evidence both supporting and 
contradicting the verdict or judgment, weighing all the evidence, the contrary 
evidence is so strong that guilt cannot be proven beyond a reasonable doubt. Id. 
at 484-85. “This standard acknowledges that evidence of guilt can 
‘preponderate’ in favor of conviction but still be insufficient to prove the 
elements of the crime beyond a reasonable doubt.” Id. at 485. In other 
words, evidence supporting a guilty finding can outweigh the contrary proof but 
still be insufficient to prove the elements of an offense beyond a reasonable 
doubt. Id.
        In 
performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses. Id. at 481; Cain v. State, 958 S.W.2d 
404, 407 (Tex. Crim. App. 1997). We may not substitute our judgment for that of 
the fact finder’s. Zuniga, 144 S.W.3d at 482.
        A 
proper factual sufficiency review requires an examination of all the evidence. Id. 
at 484, 486-87.  An opinion addressing factual sufficiency must include a 
discussion of the most important and relevant evidence that supports the 
appellant’s complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 
(Tex. Crim. App. 2003).
        C. Evidence Concerning Mallard’s Commission
                of 
an Act Clearly Dangerous to Human Life
        Dr. 
Nizam Peerwani, Tarrant County’s chief medical examiner, testified as follows:
 
Q. [PROSECUTOR:] Do you have an opinion as to whether or not the act of 
continuing to drive that motor vehicle with Mr. Biggs lodged in the windshield 
would have aggravated his condition?
 
A. 
[DR. PEERWANI:] Yes, sir, I do.
 
Q. 
And what is that opinion?
 
A. 
It certainly would have aggravated the condition.
 
Q. 
And why is that? How can you say that?
 
A. 
Well, he’s not anchored well. Motions of the car—acceleration, turning 
around corners, stopping—would shift the body and would cause more injury to 
his unsupported near amputated lower extremity and perhaps increase his vascular 
trauma and injury.
 
Q. 
Do you have an opinion as to whether or not the act of trying to pull him in or 
out of that windshield of that car within minutes of striking him would have 
aggravated him?
 
A. 
Yes, sir.
 
Q. 
And what is that opinion?
 
A. 
That would also certainly cause similar types of increase in damage to the 
tissues.
 
Q. 
Now, the very serious injury that you showed them a photograph of, of the left 
leg, are you able to tell whether any of that vascular tearing happened after 
impact or not? In other words, once the bone and skin are cut, can improper 
moving of the leg or the body cause further tearing of those veins and arteries?
 
A. 
Yes, certainly. It’s distinctly possible, sir.
 
Q. 
Do you have an opinion as to whether or not the act of driving the car in which 
Mr. Biggs was lodged and into a garage and closing the door of that garage was 
an act clearly dangerous to his life?
 
A. 
Yes, sir, in the sense that there was no help asked, certainly.
 
Q. 
Okay. In fact, do you think his odds of receiving help would have been better if 
he had been left along the roadway?
 
                . 
. . .
 
A. 
Certainly, in an enclosed garage, nobody is going to observe an injured person. 
Open space, there’s more chance somebody might observe a person and ask for 
help.
 
Q. 
Or at least some chance; is that correct?
 
A. 
Yes, sir.
 
Q. 
Do you have an opinion whether or not the act of driving Mr. Biggs to a garage 
while he was alive and leaving him in the garage and not giving him medical 
attention contributed to his cause of death?
 
A. 
Yes, sir.
 
Q. 
And what is your opinion?
 
A. 
It certainly did, sir.
 
                . 
. . .
 
Q. 
And the cause of death ultimately that you found in this case?
 
A. 
The cause of death medically was described as multiple traumatic injuries 
sustained in the auto/pedestrian collision.
 
Q. 
And the manner of death?
 
A. 
The ultimate amended manner of death was filed as homicide, sir.
 
 
        Additionally, 
the evidence adduced at trial revealed that the initial impact from the 
collision did not kill Mr. Biggs or cause injuries that would inevitably cause 
his death.[6]  Although the defense’s expert, 
Dr. Vincent Di Maio, gave his opinion that Mr. Biggs was unconscious when his 
body broke through the windshield, Dr. Di Maio agreed that Mr. Biggs could have 
survived up to two hours lodged in the windshield and that he died as a result 
of blood loss from the failure to receive medical attention. Several people 
testified that Mallard told them that Mr. Biggs lived through the initial impact 
and was able to moan; blood spatter evidence illustrated that Mr. Biggs breathed 
and moved after he was lodged partially inside the vehicle. Finally, Dr. Ray 
Swienton, the interim chairman of emergency medicine at John Peter Smith 
Hospital (JPS), testified that, to date, no patient presenting to the JPS 
emergency room with injuries similar to Mr. Biggs’s injuries has died. 
Consequently, Mallard’s actions[7] -- driving to her 
house with Mr. Biggs lodged in the windshield of her vehicle, parking her 
vehicle in her garage, and shutting the garage door—ensured Mr. Biggs’s 
death by foreclosing any possibility that he would receive medical treatment.
        Viewing 
the evidence in the light most favorable to the verdict, we hold that a rational 
trier of fact could have found the essential elements of the offense beyond a 
reasonable doubt.  Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; see 
Loredo v. State, 130 S.W.3d 275, 280 (Tex. App.—Houston [14th Dist.] 2004, 
pet. ref’d) (holding evidence legally sufficient to support conviction for 
felony murder).  Furthermore, viewing all the evidence in a neutral light, 
favoring neither party, we also conclude that the evidence supporting the 
verdict, taken alone, is not too weak to support the finding of guilt beyond a 
reasonable doubt and that the contrary evidence is not so strong that guilt 
cannot be proven beyond a reasonable doubt.  Dotson v. State, 146 
S.W.3d 285, 295 (Tex. App.—Fort Worth 2004, pet. ref’d); see Drew v. 
State, 76 S.W.3d 436, 447 (Tex. App.—Houston [14th Dist.], pet. ref’d) 
(holding evidence factually sufficient to support conviction for felony murder), 
cert. denied, 537 U.S. 1047 (2002).  Accordingly, we hold that the 
evidence is both legally and factually sufficient to support Mallard’s 
conviction for felony murder.  We overrule Mallard’s first and second 
points.
IV. Court’s 
Charge to the Jury
        In 
her third and fourth points, Mallard contends that the trial court erred by 
overruling her objection to the inclusion of the definition of transferred 
intent in the charge and by charging the jury on concurrent causation.  The 
State argues that the trial court properly charged the jury and that, 
alternatively, any harm was not egregious.
        A. Standard of Review
        Appellate 
review of alleged error in a jury charge involves a two-step process.  Abdnor 
v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we 
must determine whether error occurred.  If so, we must then evaluate 
whether sufficient harm resulted from the error to require reversal.  Id. 
at 731-32.
        Error 
in the charge, if timely objected to in the trial court, requires reversal if 
the error was “calculated to injure [the] rights of the defendant,” which 
means no more than that there must be some harm to the accused from the 
error.  Tex. Code Crim. Proc. Ann. 
art. 36.19 (Vernon 1981); see also Abdnor, 871 S.W.2d at 731-32; Almanza 
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh’g).  
In other words, a properly preserved error will call for reversal as long as the 
error is not harmless.  Almanza, 686 S.W.2d at 171.  In making 
this determination, “the actual degree of harm must be assayed in light of the 
entire jury charge, the state of the evidence, including the contested issues 
and weight of probative evidence, the argument of counsel and any other relevant 
information revealed by the record of the trial as a whole.”  Id.; 
see also Ovalle v. State, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).
        If 
error exists in the charge but no objection was lodged, we must decide whether 
the error was so egregious and created such harm that the appellant did not have 
a fair and impartial trial—in short, that “egregious harm” has 
occurred.  Almanza, 686 S.W.2d at 171; see Tex. Code Crim. Proc. Ann. art. 36.19; Hutch 
v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).  Egregious harm 
is a difficult standard to prove and must be determined on a case-by-case 
basis.  Ellison v. State, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); 
Hutch, 922 S.W.2d at 171.
        B. 
Transferred Intent
        The 
jury charge included the following abstract definition of transferred intent: 
“A person is nevertheless criminally responsible for causing a result if the 
only difference between what actually occurred and what she desired, 
contemplated, or risked is that a different offense was committed.”  The 
charge did not include an application paragraph incorporating the transferred 
intent definition.
        During 
the charge conference, Mallard objected to the inclusion of the transferred 
intent definition, arguing that the abstract definition of transferred intent 
would create confusion.  On appeal, Mallard likewise argues that the trial 
court’s inclusion of this definition undermined the jury’s consideration of 
the lesser included offense of failure to stop and render aid.
        The 
record does not demonstrate that the charge’s abstract definition of 
transferred intent caused the confusion that Mallard alleges.  During 
closing arguments, the prosecutor explained to the jurors that they could reach 
the lesser included offense only if they unanimously found Mallard not guilty of 
felony murder.  The plain language of the charge likewise instructed the 
jury to proceed to consider the lesser included offense of failure to stop and 
render aid only if they acquitted Mallard of murder.  We assume that the 
jury followed the given instructions, and there is no showing that the jury did 
not follow them.  See Luquis v. State, 72 S.W.3d 355, 366-68 (Tex. 
Crim. App. 2002).  Therefore, the trial court did not err by overruling 
Mallard’s objection to the submission of the abstract definition of 
transferred intent.  See Lewis v. State, 815 S.W.2d 560, 562 (Tex. 
Crim. App. 1991) (holding no error occurred by overruling objection and giving 
abstract instruction on transferred intent when the issue of transferred intent 
was not incorporated into the application paragraph), cert. denied, 503 
U.S. 920 (1992).  We overrule Mallard’s third point.
        C. Concurrent Causation
        The 
jury charge in question included the following abstract definition of concurrent 
causation: “A person is criminally responsible if the result would not have 
occurred but for her act, operating either alone or concurrently with another 
cause, unless the concurrent cause was clearly sufficient to produce the result 
and the act of the Defendant clearly insufficient.”  The charge did not 
include an application paragraph incorporating the concurrent causation 
definition.  Neither party objected.  On appeal, Mallard argues that 
no evidence exists to support a charge on concurrent causation.
        We 
need not determine whether the trial court erred by including the abstract 
definition of concurrent causation[8] because, in any 
event, the inclusion of the concurrent causation instruction did not egregiously 
harm Mallard.  Here, the abstract paragraph on causation did not apply that 
theory to the facts of the instant case.  Neither did the application 
paragraph incorporate the concept of concurrent causation.  The absence of 
an application paragraph incorporating the concept of concurrent causation means 
that the jury was not authorized to convict on a theory applying concurrent 
causation.  See Hughes v. State, 897 S.W.2d 285, 297 (Tex. 
Crim. App. 1994) (holding no harm occurred by giving superfluous abstract 
instruction on causation when the issue of causation was not incorporated into 
the application paragraph and jury was not authorized to convict on that theory 
of causation), cert. denied, 514 U.S. 1112 (1995); accord Garrett v. 
State, 642 S.W.2d 779, 781 (Tex. Crim. App. 1982) (holding that although a 
proper charge should correctly apply transferred intent to the facts, the 
failure to do so does not constitute a fundamental defect requiring 
reversal).  Accordingly, Mallard was not egregiously harmed by the 
inclusion of an abstract definition of concurrent causation.  See Hughes, 
897 S.W.2d at 297.  We overrule Mallard’s fourth point.
V. Motion for 
Mistrial
        In 
her fifth point, Mallard asserts that the trial court erred by overruling her 
request for a mistrial after the State allegedly commented on her post-arrest 
silence during the punishment phase of trial.  The State responds that the 
objection was untimely.  Mallard testified during the punishment 
phase.  During the State’s cross-examination, the following exchange took 
place:
  
[PROSECUTOR:] Ms. Mallard, I’m going to ask you some questions about your 
testimony. We haven’t talked before, right?
 
[MALLARD:] 
No, sir.
 
[PROSECUTOR:] 
May I approach, Your Honor?
 
THE 
COURT: You may.
 
[DEFENSE 
COUNSEL:] Your Honor — objection, Your Honor.  May we approach?
 
(At 
the bench, on the record:)
 
[DEFENSE 
COUNSEL:] That is a comment on the failure — that is a comment on her ability 
to assert the Fifth Amendment.  That’s absolutely error.  I do not 
want to call the jury’s attention to it and focus on it, but I want a 
mistrial, and I want it right now.
 
THE 
COURT: Denied.
 
[DEFENSE 
COUNSEL:] Your Honor, I want for the record . . . exactly what he said.  He 
said, “You and I have not talked before,” and that is clearly a comment on 
her assertion of the Fifth Amendment right.  Clearly.
 
[PROSECUTOR:] 
Your Honor, we just ask for a[n] instruction to disregard if he believes 
that’s what I was referring to.  That wasn’t my intent.
 
(Open 
court:)
 
THE 
COURT: All right.  Jury will disregard the last question.
                         You 
may continue.
 
[DEFENSE 
COUNSEL:] Your Honor, I renew my request for a mistrial.
 
THE 
COURT: Denied.
 
 
        To 
preserve a complaint for our review, a party must have presented to the trial 
court a timely request, objection, or motion that states the specific grounds 
for the desired ruling if they are not apparent from the context of the request, 
objection, or motion.  Tex. R. App. 
P. 33.1(a)(1); Mosley v. State, 983 S.W.2d 249, 265 (Tex. Crim. 
App. 1998) (op. on reh’g), cert. denied, 526 U.S. 1070 (1999).  
Further, the trial court must have ruled on the request, objection, or motion, 
either expressly or implicitly, or the complaining party must have objected to 
the trial court’s refusal to rule.  Tex. R. App. P. 33.1(a)(2); Mendez v. 
State, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).
        Here, 
Mallard responded to the prosecutor’s initial question, the prosecutor asked 
for permission to approach Mallard to show her an exhibit, the trial court 
granted the prosecutor permission to approach Mallard, and then defense counsel 
objected to the question.  Consequently, the objection was untimely. See 
Lagrone v. State, 942 S.W.2d 602, 618 (Tex. Crim. App.) (stating that if 
defendant fails to object until after an objectionable question has been asked 
and answered, his objection is untimely), cert. denied, 522 U.S. 917 
(1997).  Because the objection was untimely, Mallard forfeited this 
point.  See Mendez, 138 S.W.3d at 342 (holding that appellant 
forfeited his right to present claim on appeal by failing to present timely 
objection to the trial court).  Therefore, we overrule Mallard’s fifth 
point.
VI. Conclusion
        Having 
overruled each of Mallard’s points, we affirm the trial court’s judgment.
  
  
                                                                  SUE 
WALKER
                                                                  JUSTICE
  
  
 
PANEL 
F:   GARDNER, WALKER, and MCCOY, JJ.
 
PUBLISH
 
DELIVERED: 
March 3, 2005

 
NOTES
1.  
Mallard’s appellate points challenge only her murder conviction, not her 
conviction for tampering with evidence.
2.  
Both women are certified nurse’s assistants.
3.  
Titilisee Fry goes by “T.”
4.  
Vaughn’s real name is Clete Denal Jackson.
5.  
Mallard does not challenge the sufficiency of the evidence to support the 
failure-to-stop-and-render-aid element of the felony murder charge.  
Consequently, we will not analyze the sufficiency of that aspect of the 
evidence.
6.  
The State proved that Mr. Biggs was not suffering from any life-threatening 
illness at the time of his death.
7.  
Mallard’s actions related to the unchallenged failure-to-stop-and-render-aid 
felony murder element included her failure to stop and call for help at one of 
the nine pay phones between the accident site and her home and her failure to 
drive 6.1 miles to JPS or 0.7 miles to the nearest fire station to obtain 
medical assistance.
8.  
The State provides a well-reasoned analysis of why inclusion of the concurrent 
causation definition in the charge was not erroneous.  We decline, however, 
to undertake an error analysis in this instance because, as discussed above, no 
egregious harm resulted from the unobjected-to alleged error.  Accord 
Tong v. State, 25 S.W.3d 707, 718 (Tex. Crim. App. 2000) (op. on reh’g) 
(stating that “this Court has occasionally analyzed voir dire issues solely on 
the basis of harm, skipping the preliminary question of error”), cert. 
denied, 532 U.S. 1053 (2001).